SUE YEE LEE, by her next friend, Kwei Hwang Lee, Kwei Hwang Lee, Individually, and Jen Ju Lee, Individually, Plaintiffs–Appellants,

v.

LAFAYETTE HOME HOSPITAL, INC., Arnette Clinic, Alan A. Alexander, M.D., R. E. Hanneman, M.D., F. C. Robinson, M.D., Henry Feuer, M.D., William W. Wishard Memorial Hospital, A Division of Health and Hospital Corporation of Marion County, and Indiana University Hospitals, Defendants–Appellees.

No. 2–280A36.

Court of Appeals of Indiana,
First District.

Sept. 29, 1980.

Stephen B. Caplin and Terrence P. Pehler, Indianapolis, for plaintiffs–appellants.

James V. Donadio & Geoffrey Segar, William B. Weisell, Edward Squier Neal, John G. Forbes, John R. Hiner, Theodore L. Sendak, Atty. Gen., Kathleen G. Lucas, Deputy Atty. Gen., Indianapolis, for defendants–appellees.

RATLIFF, Judge.

## STATEMENT OF THE CASE

Sue Yee Lee ("Susie") by her next friend Kwei Hwang Lee, and Kwei Hwang Lee ("Jim") and Jen Ju Lee ("Betty"), as parents of Susie, appeal from a decision granting summary judgment in favor of Lafayette Home Hospital, Inc.; Arnette Clinic; Alan A. Alexander, M.D.; R. E. Hanneman, M.D.; F. C. Robinson, M.D.; William W. Wishard Memorial Hospital; and Indiana University Hospital; and from the sustaining of the motion to dismiss of Henry Feuer, M.D.[1] The trial court granted summary judgment and sustained the motion to dismiss on the ground that "[the] court does not have jurisdiction of this cause at this time." We affirm.

## STATEMENT OF THE FACTS

Susie, by her next friend, Jim; and Jim and Betty as parents of Susie brought this action against the defendant physicians and hospitals, all of whom are qualified health care providers under the Indiana Medical Malpractice Act (Ind. Code 16–9.5–1–1 et seq.). Susie sought damages for personal injuries. Jim and Betty, as parents of Susie, sought damages for loss of services of Susie and for Susie's medical expenses, past, present, and future. Both Susie's claim and the claim of Susie's parents are predicated upon alleged medical malpractice by the named defendant health care providers. At the time of the filing of the action in the trial court, the plaintiffs had filed a copy of their proposed complaint with the commissioner of insurance of this state as required by the act. All defendants except Dr. Feuer filed motions for summary judgment accompanied by an affidavit from the Chief Deputy Commissioner of the Indiana Department of Insurance attesting to the facts that although a proposed complaint had been filed with the Commissioner, no medical review panel had ever been convened or rendered a written opinion on the plaintiff's claim. Dr. Feuer filed a motion to dismiss accompanied by a similar affidavit. Such affidavits also attested that each of the defendants was a qualified health care provider under the act. These motions contended the convening of a medical review panel and the rendering of a written opinion by them was a jurisdictional prerequisite to suit which had not been met.

The Lees did not file any counter–affidavits or present any evidence controverting the facts alleged in the affidavits filed by the defendants. The trial court agreed with the position of the defendants and granted the summary judgments and motions to dismiss from which the Lees appeal.

## STATEMENT OF THE ISSUES

1. Whether the Indiana Medical Malpractice Act (Ind. Code 16–9.5–1–1 et seq.) is unconstitutional.

2. Whether the parents of Susie were subject to the Indiana Medical Malpractice Act and required to comply with the provisions of the act prior to instituting their civil action to recover damages for the loss of services of, and medical expenses for, their minor child.

## DISCUSSION AND DECISION

*Issue One*

██ The question of the constitutionality of the Indiana Medical Malpractice Act was resolved by the decision of our Supreme Court in *Johnson v. St. Vincent Hospital,*

1. Feuer's denominated motion to dismiss raised issues outside the pleadings and was accompanied by an affidavit setting forth certain factual matters. Such issue more appropriately should have been the subject of a motion for summary judgment under Ind. Rules of Procedure, Trial Rule 56. Such motion should have been considered as a T.R. 56 motion for summary judgment by the trial court. However, Feuer's motion raised the identical issue raised by the motions for summary judgment of the other defendants, and was sustained by the trial court upon the same grounds as were the motions for summary judgment. Since the motion to dismiss and the motions for summary judgment were predicated upon the same facts and same grounds and were sustained by the trial court on the same basis, we shall treat said motions as being the same in deciding this appeal.

*Inc.*, (1980) Ind., 404 N.E.2d 585, holding the act to be constitutional. All of the constitutional objections raised here were raised in the *Johnson* case, *supra*, and decided against the contentions of the Lees. In their reply brief, the Lees concede that *Johnson, supra*, is dispositive of the constitutionality issue and that such issue, by reason of the holding in *Johnson*, is now moot. Consequently, there is no error as to this issue.

*Issue Two*

Jim and Betty contend that their independent action for damages for the loss of Susie's services and for her medical expenses is not within the purview of the Indiana Medical Malpractice Act. On the other hand, the defendant physicians and hospitals, as "health care providers" under the act, assert that the parents' action here is subject to the act.

In deciding this issue, we must first look to the pertinent provisions of the Indiana Medical Malpractice Act. Relevant definitions are found in IC 16–9.5–1–1:

"As used in this article:

"(a) 'Health care provider' means:

"(1) A person, partnership, corporation, professional corporation, facility or institution licensed or legally authorized by this state to provide health care or professional services as a physician, psychiatric hospital, hospital, dentist, registered or licensed practical nurse, optometrist, podiatrist, chiropractor, physical therapist or psychologist, or an officer, employee or agent thereof acting in the course and scope of his employment;

.  .  .  .  .

"(4) A home health agency, as defined under IC 16–10–2.5–1.

"(b) 'Physician' means a person with an unlimited license to practice medicine in this state under IC 25–22.5 [25–22.5–1–1.-1–25–22.5–9–14].

"(c) 'Patient' means a natural person who receives or should have received health care from a licensed health care provider, under a contract, express or implied.

"(d) 'Hospital' means a public or private institution licensed under IC 16–10–1 [16–10–1–1–16–10–1–19].

"(e) 'Commissioner' means the commissioner of insurance of this state.

"(f) 'Representative' means the spouse, parent, guardian, trustee, attorney or other legal agent of the patient.

"(g) 'Tort' means any legal wrong, breach of duty, or negligent or unlawful act or omission proximately causing injury or damage to another.

"(h) 'Malpractice' means any tort or breach of contract based on health care or professional services rendered, on which should have been rendered, by a health care provider, to a patient.

"(i) 'Health care' means any act, or treatment performed or furnished, or which should have been performed or furnished, by any health care provider for, to, or on behalf of a patient during the patient's medical care, treatment or confinement. . . ."

The right to file suit for malpractice is provided to a patient or his representative in IC 16–9.5–1–6:

"Subject to chapter 9 [16–9.5–9–1–16–9.-5–9–10], a patient or his representative having a claim under this article [16–9.5–1–1–16–9.5–9–10] for bodily injury or death on account of malpractice may file a complaint in any court of law having requisite jurisdiction and demand right of trial by jury. No dollar amount or figure shall be included in the demand in any malpractice complaint, but the prayer shall be for such damages as are reasonable in the premises."

The act further provides for the submission of the proposed complaint to a medical review panel prior to suit:

"16–9.5–9–1. . . . Provision is made for the establishment of medical review panels to review all proposed malpractice complaints against health care providers covered by this article.

"The filing of a proposed complaint tolls the applicable statute of limitations to and including a period of ninety [90]

days following the receipt of the opinion of the medical review panel by the claimant. A proposed complaint under this chapter [16–9.5–9–1–16–9.6–9–10] shall be deemed filed when a copy of the proposed complaint is delivered or mailed by registered or certified mail to the commissioner, who shall within ten [10] days after receipt forward by registered or certified mail a copy to each health care provider named as a defendant at his last and usual place of residence or his office.

"Not earlier than twenty [20] days after the filing or a proposed complaint either party may request the formation of a medical review panel by serving a request by registered or certified mail upon all parties and the commissioner."

"16–9.5–9–2.... No action against a health care provider may be commenced in any court of this state before the claimant's proposed complaint has been presented to a medical review panel established pursuant to this chapter [16–9.-5–9–1–16–9.5–9–10] and an opinion is rendered by the panel."

A special statute of limitations applicable to medical malpractice is also provided by the act in IC 16–9.5–3–1:

"No claim, whether in contract or tort, may be brought against a health care provider based upon professional services or health care rendered or which should have been rendered unless filed within two [2] years from the date of the alleged act, omission or neglect except that a minor under the full age of six [6] years shall have until his eighth birthday in which to file. This section applies to all persons regardless of minority or other legal disability."

It is over the effect of the foregoing provisions of the act that this controversy is centered. Jim and Betty contend their action is an independent action for injury to their property right, namely their child, citing *Siebeking v. Ford*, (1958) 128 Ind.App. 475, 148 N.E.2d 194; and *Hahn v. Moore*, (1956) 127 Ind.App. 149, 133 N.E.2d 900, *reh. den.* 134 N.E.2d 705. They argue their independent action, as parents, for loss of services of their child and for medical expenses for the child, is not brought by them in a representative capacity. Further, they assert they were never patients of the defendant health care providers either under the statutory definition of the term "patient" appearing in the act, or under recognized definitions of that term as found in leading legal and medical dictionaries. Therefore, since they were not patients, and do not sue in a representative capacity, Jim and Betty claim to be clearly outside the coverage of the Indiana Medical Malpractice Act.

Jim and Betty also argue that since the act refers only to actions by patients and representatives of patients that the maxim *expressio unius est exclusio alterius* [2] applies and excludes their independent action as parents from the coverage of the act since such actions are not specifically mentioned.

On the other hand, the defendants contend that since the statutory definition of the term "representative" in the act includes parents, and since Jim and Betty are parents of Susie and brought their action as parents, they are clearly within the coverage of the act. Further, defendants assert that a construction of the act which would exclude the parents' action is illogical and unworkable and that the legislature could not have intended such a result because such would thwart the purpose of the act.

The defendants also contended that the language of the previously quoted statutory provisions makes it clear that any tort action based upon alleged medical malpractice is subject to the act.

In determining the meaning of statutes there are certain rules which we are bound to follow. It has been consistently held in Indiana that judicial construction of a statute is permissible only where the

2. Expression of one thing is the exclusion of another. *Black's Law Dictionary*, Rev. 4th Ed., p. 692.

statute is ambiguous and of doubtful meaning. *Bowen v. Review Board of Indiana Employment Security Division*, (1977) Ind. App., 362 N.E.2d 1178; *Ott v. Johnson*, (1974) 262 Ind. 548, 319 N.E.2d 622; 26 I.L.E., *Statutes*, § 101. If the language of the statute is plain and unambiguous, judicial interpretation is inappropriate and the courts will adopt the meaning clearly expressed. *Bowen, supra; Town of Merrillville v. Lincoln Utilities, Inc.*, (1976) Ind. App., 355 N.E.2d 851. If however, a statute is ambiguous and its meaning is not clear from the words used, judicial construction is proper. In such case, the purpose and goal of judicial construction is to give effect to the intention of the legislature. *Gonser v. Board of Commissioners for Owen County*, (1978) Ind.App., 378 N.E.2d 425. A statute should be construed to accomplish the end for which it was enacted. *Wilfong v. Indiana Gas Co.*, (1980) Ind.App., 399 N.E.2d 788.

We believe the Indiana Medical Malpractice Act to be ambiguous and unclear in meaning with regard to whether or not the action of parents for loss of services of, and medical expenses for, a minor child is subject to the act. Therefore, judicial construction is appropriate for the purpose of ascertaining the intention of the legislature and accomplishing the purpose for which this statute was enacted.

▆ In ascertaining legislative intent and interpreting a statute in such a manner that the legislative purpose will be accomplished, it is proper to consider the historical background leading to the enactment of the statute. This background material is provided by Justice DeBruler in *Johnson*, at 404 N.E.2d 589–590 as follows:

"In the Mansur case a great deal of proof descriptive of the conditions in the health care and insurance industries which gave rise to the Act was brought forth and developed at a trial for constitutional purposes. Immediately prior to its enactment seven of the ten insurance companies writing the majority of medical malpractice insurance policies in the State ceased or limited writing such insurance because of unprofitability or an inability to calculate an adequate premium. Premiums had already increased as much as 1200 percent over a period of fifteen years because of the increase in the number and size of claims. Physicians practicing high risk specialties such as anesthesiology were hard pressed or totally unable to purchase insurance coverage. In some rural areas surgery was reported cancelled. Emergency services were discontinued at some hospitals. Health care providers had become fearful of the exposure to malpractice claims and at the same time were unable to obtain adequate malpractice insurance coverage at reasonable prices.

"According to the Legislature's appraisal, these conditions implicated the vital interests of the community in the availability of the professional services of physicians and other health care providers. The Legislature responded with this Act in an effort to preserve those services and thereby to protect the public health and wellbeing of the community. It reflects a specific legislative judgment that a causal relationship existed at the time between the settlement and prosecution of malpractice claims against health care providers and the actual and threatened diminuation [sic] of health care services. The exceptionally high cost and even unavailability of malpractice insurance were major links in the relational chain. They in turn were connected through the large settlements and judgments being paid to patients. To the extent that these sums were excessive or unjustifiable, they had become so large because the processes by which evidence of negligent conduct was being gathered, evaluated, and used were faulty. Subsidiarily, these sums were being unnecessarily increased because the habitually negligent health care providers were not being identified and dealt with, very large attorney fees were being charged, and the time limitations upon bringing malpractice actions were too long.

"With these judgments as its basis the Act created voluntary state–sponsored liability insurance for doctors and other

health care providers, created a patient compensation fund, took measures to prevent injuries to patients through the negligence of health care providers, and subjected negligence claims against health care providers to special controls limiting patient remedies."

(*See also*, Note, *The Indiana Medical Malpractice Act: Legislative Surgery on Patients' Rights,* 10 Val.U.L.R. 303 (1976), for another enumeration of the factors leading to the enactment of this legislation.)

■ Viewed from the historical perspective we believe the conclusion is inescapable that our General Assembly intended that all actions the underlying basis for which is alleged medical malpractice are subject to the act. Since the obvious purpose of the act is to provide some measure of protection to health care providers from malpractice claims, and to preserve the availability of the professional services of physicians and other health care providers in the communities and thereby protect the public health and well–being, it is totally inconceivable that the legislature intended to extend this protection only to actions wherein the actual patient was the party plaintiff and to exclude other claims for medical malpractice wherein the plaintiff was not the actual patient, but one whose right of action was derived from the patient such as the parents' claim here. Nor do we believe the legislature intended to exclude plaintiffs such as Jim and Betty whose action for loss of services and medical expenses is derived from a claim of medical malpractice inflicted upon their minor child simply because such a claim is not specifically mentioned in the act.

■ Our courts have recognized the maxim *expressio unius est exclusio alterius* in appropriate cases stating that when the legislature specifies only certain factors or matters in a statute, by implication, other facts, or things not so specified, are excluded. *Duda v. New Prairie United School Corp.,* (1967) 140 Ind.App. 528, 224 N.E.2d 327. However, this maxim is applied as an aid in the construction of statutes rather than as a rule of law. *Creasey v. Pyramid Coal Corp.,* (1945) 116 Ind.App. 124, 61 N.E.2d 477. The maxim is to be used only as an aid in arriving at the legislative intent. It is not to be followed blindly with the effect of overriding or defeating clear legislative intent. *Creasey, supra; Gates v. Hickman,* (1947) 117 Ind.App. 414, 70 N.E.2d 441. It has also been said that this maxim may be persuasive in a doubtful case but it is not conclusive. *Nash Engineering Co. v. Marcy Realty Corp.,* (1944) 222 Ind. 396, 54 N.E.2d 263. We do not consider this to be a case involving a doubtful legislative purpose. Rather, we think the intention of the legislature is clear. Application of the maxim *expressio unius est exclusio alterius* to reach the result insisted upon by Jim and Betty would lead to absurdity. We do not believe the maxim to be applicable to this case. Thus, we believe all persons having causes of actions founded upon alleged medical malpractice are subject to, and must comply with the act. Therefore, we hold that the action of Jim and Betty seeking recovery of damages for the loss of Susie's services and for her medical expenses was subject to the Indiana Medical Malpractice Act. Since, under the act, submission of the complaint to a medical review panel and the obtaining of a written opinion from that panel was a necessary prerequisite to suit, which prerequisite was not met here, the trial court's judgment was correct.

Judgment affirmed.

ROBERTSON, P. J., and NEAL, J., concur.