**WINONA MEMORIAL FOUNDATION OF INDIANAPOLIS and Winona Memorial Hospital, Appellants (Defendants Below),**

v.

**Rochelle A. LOMAX, Appellee (Plaintiff Below).**

**No. 4–583A138.**

Court of Appeals of Indiana, Fourth District.

June 25, 1984.

Rehearing Denied July 27, 1984.

Robert A. Fanning, Locke, Reynolds, Boyd & Weisell, Indianapolis, Stephen A. Free, Free, Brand, Tosick & Allen, Greenfield, for appellant.

F. Boyd Hovde, Townsend, Hovde, Townsend & Montross, Indianapolis, for appellee.

MILLER, Judge.

Defendants Winona Memorial Foundation of Indianapolis and Winona Memorial Hospital (collectively referred to hereafter as Winona), bring this interlocutory appeal from the trial court's denial of their motion for summary judgment and the entry of partial summary judgment (finalized by the trial court pursuant to Ind.Rules of Procedure, Trial Rule 56(C)) in favor of the plaintiff-appellee, Rochelle Lomax. Lomax claimed she was injured when she tripped and fell over a protruding floorboard on Winona's premises as she prepared to receive physical therapy treatment. She alleged Winona's negligent failure to maintain its floor in a reasonably safe condition caused her to fall. Winona argued that the language of the Medical Malpractice Act was broad enough to encompass Lomax's claim and that her failure to obtain a medical review panel opinion before commencing her action in court, as required by the Act, entitled Winona to summary judgment. The trial court held Lomax's claim

was not within the scope of the Act, and its procedures, therefore, did not apply. Winona's motion for summary judgment was thus denied and partial summary judgment was entered in favor of Lomax. We affirm.

## FACTS

On February 7, 1979, Lomax was in Winona Memorial Hospital to receive physical therapy treatment prescribed by her doctor. On that date, Winona was qualified as a health care provider within the meaning of the Medical Malpractice Act, IND.CODE 16–9.5–2–1. For the purposes of this appeal, it may be presumed Lomax was a patient,[1] as defined in the Act. *See,* IND. CODE 16–9.5–1–1(c).

Before receiving her therapy, which was to be conducted in a large pool, Lomax was instructed to change her clothes in a dressing room with a board floor adjacent to the pool area. She did so, unattended by any of Winona's employees. On her way from the dressing room to the pool area, Lomax tripped and fell when she caught her foot on a floorboard that protruded above floor level. No employee of Winona was assisting Lomax at the time of her fall, and no medical or physical therapy treatment was rendered to her before or at the time of her fall.

On August 8, 1979, Lomax filed her complaint in court, alleging Winona's negligent maintenance of the floor adjacent to the pool area was the cause of her fall and of her injuries, including a herniated disc in her lower back and a numbing of the right side of her body. Winona moved to dismiss the complaint on the grounds that Lomax had failed to comply with the Medical Malpractice Act by failing to present a proposed complaint to the Insurance Commission for review by a medical review panel before commencing her action in court. *See* IND.CODE 16–9.5–9–2. Winona's mo-

---

**1.** In its findings of fact, the trial court did not specifically find Lomax was a patient, and Winona asserts this as error. Inasmuch as Lomax alleges in her complaint that she was a patient, and as Winona admits this in its answer to the complaint, however, it is clear that the trial court's holdings did not rest on a contrary conclusion. There is no reversible error on this point.

tion to dismiss was denied on April 23, 1981.

On October 21, 1982, Winona filed a motion for summary judgment on the same grounds as its motion to dismiss.[2] The summary judgment motion was supported by the Affidavit of the Chief Deputy Insurance Commissioner stating that Winona was a qualified health care provider and that the Insurance Commission had not received an opinion from any medical review panel concerning Lomax's allegations of negligence. Lomax responded with an affidavit of her own, swearing to the circumstances surrounding her fall and disclaiming that her injuries resulted from malpractice or from professional services rendered or not rendered. The trial court held Lomax's claim was not within the Medical Malpractice Act and, therefore, was not subject to the precondition of review by a medical review panel. Winona's motion for summary judgment was thus denied, and, pursuant to T.R. 56(B), the trial court entered summary judgment for Lomax on the issue of whether her claim was within the scope of the Act.

## DECISION

■ We begin our discussion of the propriety of the trial court's grant of partial summary judgment to Lomax under T.R. 56(B) by reciting the applicable standard of review. Generally, summary judgment is appropriate only when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. T.R. 56(C). Trial Rule 56(B), however, authorizes the trial court to grant summary judgment to a non-moving party on issues raised in a motion for summary judgment filed by any party. A summary judgment on less than all the issues in a claim is interlocutory and not appealable unless, as in this case, the trial court expressly determines in writing that there is no just reason for delay and directs entry of judgment as to less than all the issues. T.R. 56(C).

In reviewing the grant of a partial summary judgment, we apply the same standards as the trial court, and we must reverse the judgment of an unresolved issue of material fact appears in the record or if the law was incorrectly applied to undisputed facts. *Jones v. City of Logansport,* (1982) Ind. App., 436 N.E.2d 1138, 1143.

Because it is undisputed that Lomax was a patient (R. 2, 31) and Winona was a qualified health care provider (R. 20, 87) within the meaning of the Medical Malpractice Act, the only issue for decision on this appeal is whether the trial court properly determined, as a matter of law, that Lomax's claim of Winona's negligent failure to maintain its premises in a reasonably safe condition was not within the scope of the Act. Winona essentially argues: (1) the language of the Act is clear on its face, without need of construction, and broad enough to encompass Lomax's claim; (2) the purpose of the Act requires that all claims by a patient against a health care provider be included within the Act; and (3) this court's decision in *Methodist Hospital of Indiana, Inc. v. Rioux,* (1982) Ind.App., 438 N.E.2d 315, is direct and controlling authority for the inclusion of Lomax's claim within the Act. Lomax, on the other hand, contends: (1) literal application of the supposedly clear language of the Medical Malpractice Act would lead to absurd and contradictory results, which can be avoided only by proper statutory construction; (2) the purpose and structure of the Act require exclusion of Lomax's claim from its coverage; and (3) the language of the *Rioux* decision on which Winona relies is dicta and, therefore, not controlling in the present case. We agree with the arguments made by Lomax and affirm the trial court.

### Need for Statutory Construction

Winona's argument begins with the proposition that a statute that is "clear and unambiguous on its face need not and can-

---

**2.** In the interim, this court decided *Methodist Hospital v. Rioux,* (1982) Ind.App., 438 N.E.2d

315, upon which Winona places great emphasis.

not be interpreted by a court." *Indiana Board of Tax Commissioners v. Holthouse Realty Corp.* (1976) 170 Ind.App. 232, 239, 352 N.E.2d 535, 539. Winona contends the language of the definitional section of the Medical Malpractice Act, IC 16-9.5-1-1, clearly and unambiguously defines Lomax's claim as being within the Act. Specifically, Winona points to the following definitions:

" 'Malpractice' means any tort or breach of contract based on health care or professional services rendered, or which should have been rendered, by a health care provider, to a patient."

IC 16-9.5-1-1(h).

" 'Tort' means any legal wrong, breach of duty, or negligent or unlawful act or omission proximately causing injury or damage to another."

*Id.* § 1(g).

" 'Health care' means any act, or treatment performed or furnished, or which should have been performed or furnished, by any health care provider for, to, or on behalf of a patient during the patient's medical care, treatment or confinement."

*Id.* § 1(i). Winona places special emphasis on the words "any act" in this definition. Also relevant is the following:

" 'Health care provider' means:

(1) a person, partnership, corporation, professional corporation, facility or institution licensed or legally authorized by this state to provide health care or professional services as a physician, psychiatric hospital, hospital, dentist, registered or licensed practical nurse, optometrist, podiatrist, chiropractor, physical therapist or psychologist, or an officer,

employee or agent thereof acting in the course and scope of his employment."

*Id.* § 1(a)(1).

Putting these definitions together, Winona concludes: "Malpractice, then, by definition is any breach of duty or negligent act or omission by a health care provider to a patient." Appellants' Brief at 14.[3] Winona argues the clear, unambiguous effect of these definitions is to place Lomax's claim squarely within the Medical Malpractice Act without the need, or even permissibility, of statutory construction, and to reject the distinction Lomax attempts to draw between "classical" medical malpractice, which she admits is within the Medical Malpractice Act, and ordinary negligence, which she contends is not.

The basis for Lomax's contention is the absurd and contradictory results she claims would arise from application of the Act to "premises liability" or "ordinary negligence" claims such as hers.[4] She points out that, presumably, "the Legislature does not intend an absurdity, and such a result will be avoided if the terms of the act admit of it by a reasonable construction." *In re Estate of Pickens*, (1970) 255 Ind. 119, 128, 263 N.E.2d 151, 156.

Lomax contends that Winona's position that every claim by a patient against a qualified health care provider comes within the Medical Malpractice Act leads to absurd results. For example, under that construction of the Act, all of the following claims would be subject to the requirements and procedures of the Act: (1) the claim of a patient who was injured when a light fixture fell on him in his hospital bed; (2) the claim of an ambulatory patient who, while walking down a hospital hallway with

---

**3.** A more complete integration of these definitions was provided by this court in *Methodist Hospital of Indiana, Inc. v. Rioux,* (1982) Ind. App., 438 N.E.2d 315, where we stated the Medical Malpractice Act applies to

"any legal wrong, breach of duty, or negligent or unlawful act or omission proximately causing injury to another based on any act or treatment performed or furnished, or which should have been performed or furnished by the hospital for, to, or on behalf of a patient

during the patient's medical care, treatment or confinement."

*Id.* at 316.

**4.** Lomax's theory is that her claim should be treated under the common law as the claim of a business invitee to whom the hospital owed a duty of reasonable care. The common law has generally accepted the invitee status of patients in a hospital, Annot., 16 A.L.R.3d 1237, 1238 (1967), or in a doctor's or dentist's office, Annot. 36 A.L.R.3d 1341, 1343 (1971).

a visiting friend, was injured when he slipped and fell on soapy water left on the floor by a hospital janitor, even though the visitor's claim would not be subject to the Act if he also fell and was injured; (3) the claim of a patient who was slandered by a hospital employee; and (4) the claim of a patient who was assaulted by a hospital employee.

Lomax also argues that application of the Act to her complaint would achieve a contradictory result with regard to the admissibility of expert witness testimony under Indiana law. As previously noted, the Medical Malpractice Act requires a claimant to submit a proposed complaint to the Insurance Commission for review by and an opinion of a medical review panel as a condition precedent to filing an action in court. IC 16–9.5–9–2. The Act charges the review panel with "the sole duty to express its expert opinion as to whether or not the evidence supports the conclusion that the defendant or defendants acted or failed to act within the appropriate standards of care as charged in the complaint." IND.CODE 16–9.5–9–7. Further, the Act provides: "Any report of the expert opinion reached by the medical review panel shall be admissible as evidence in any action subsequently brought by the claimant in a court of law ...." IND.CODE 16–9.- 5–9–9. Lomax first argues that health care providers, who must be included on the medical review panel,[5] are not expert in such matters as the maintenance of reasonably safe premises. Secondly, Lomax argues that such matters are within the common knowledge and experience of juries, and thus, expert testimony regarding the exercise of reasonable care is improper and should be excluded. *Emig v. Physicians' Physical Therapy Service*, (1982) Ind.App., 432 N.E.2d 52 (case not decided under Medical Malpractice Act); *see also Rosenbalm v. Winski*, (1975) 165 Ind.App. 378, 332 N.E.2d 249; *Brunker v. Cummins*, (1892) 133 Ind. 443, 32 N.E. 732. Thus,

Lomax contends, inclusion within the Act of a claim such as hers would cause a contradiction between a longstanding rule of evidence under Indiana law and Code section 16–9.5–9–9. She contends the legislature could not have intended such a result.

The rules that determine when judicial construction of a statute is appropriate were reviewed in *Sue Yee Lee v. Lafayette Home Hospital, Inc.*, (1980) Ind.App., 410 N.E.2d 1319:

> "In determining the meaning of statutes there are certain rules which we are bound to follow. It has been consistently held in Indiana that judicial construction of a statute is permissible only where the statute is ambiguous and of doubtful meaning. *Bowen v. Review Board of Indiana Employment Security Division*, (1977) [173] Ind.App. [166] 362 N.E.2d 1178; *Ott v. Johnson*, (1974) 262 Ind. 548, 319 N.E.2d 622; 26 I.L.E., *Statutes*, § 101. If the language of the statute is plain and unambiguous, judicial interpretation is inappropriate and the courts will adopt the meaning clearly expressed. *Bowen, supra; Town of Merrillville v. Lincoln Utilities, Inc.*, (1976) [171] Ind.App. [224] 355 N.E.2d 851. If however, a statute is ambiguous and its meaning is not clear from the words used, judicial construction is proper. In such cases, the purpose and goal of judicial construction is to give effect to the intention of the legislature. *Gonser v. Board of Commissioners for Owen County*, (1978) [177] Ind.App. [74] 378 N.E.2d 425. A statute should be construed to accomplish the end for which it was enacted. *Wilfong v. Indiana Gas Co.*, (1980) Ind.App., 399 N.E.2d 788."

*Id.* at 1322–23; *see also Field v. Area Plan Commission*, (1981) Ind.App., 421 N.E.2d 1132, 1137.

---

**5.** IND.CODE 16–9.5–9–3 states: "The medical review panel shall consist of one (1) attorney and three (3) health care providers. The attorney shall act as chairman of the panel and in an advisory capacity, but shall have no vote." The definition of health care provider is found at IC 16–9.5–1–1(a). *See supra* at 734.

*Sue Yee Lee* was decided under the Medical Malpractice Act and contains a number of factual similarities to the present case. There, the parents of a young girl sought to recover damages for loss of services and medical expenses of their daughter, allegedly caused by the medical malpractice of the defendants. The defendants were awarded summary judgment on the grounds that the parents had failed to obtain the opinion of a medical review panel prior to commencing their action in court, as required by the Act, IC 16–9.5–9–2. The parents argued that because the Act referred only to actions by "a patient or his representative," IND.CODE 16–9.5–1–6, their independent action as parents was excluded from the coverage of the Act because not specifically mentioned—*expressio unius est exclusio alterius*. The defendants contended that because the statutory definition of the term "representative" included the "parent . . . of the patient," IC 16–9.5–1–1(f), the action by the parents was clearly within the Act. Despite the court's eventual conclusion that the parents' claim was within the Act and despite the facially unambiguous effect of the interaction of the definition of the term "representative" with the authorization of an action by "a patient or his representative," the court in *Sue Yee Lee* held the Medical Malpractice Act "to be ambiguous and unclear *in meaning* with regard to whether or not the action of parents for loss of services of, and medical expenses for, a minor child is subject to the Act." 410 N.E.2d at 1319 (emphasis added).

In *In re Estate of Pickens*, (1980) 255 Ind. 119, 263 N.E.2d 151, the decedent's representative brought a wrongful death action against the decedent's wife, who had caused the death by gunshot. The wife defended on the ground that the literal language of the Indiana Wrongful Death Act precluded an action by the decedent's representative because the decedent himself could not have sued his wife had he lived, under the doctrine of interspousal immunity. The *Pickens* court quoted the Wrongful Death Act:

> "*Action for wrongful death*—When the death of one is caused by the wrongful act or omission of another, the personal representative of the former may maintain an action therefore against the latter, *if the former might have maintained an action had he or she, as the case may be, lived*, against the latter for an injury for the same act or omission. * * *."

255 Ind. at 125, 263 N.E.2d at 155 (Emphasis supplied.) Despite the clarity of the language of the statute, the court stated:

> "From a literal reading of the statute it would appear that appellant would be precluded from recovery since the decedent would not, because of the immunity doctrine, have been able to maintain the action had he lived. However . . . we do not believe such a construction to be intended or required."

*Id.*, 263 N.E.2d at 155.

In *Dague v. Piper Aircraft Corp.*, (1981) Ind., 418 N.E.2d 207, a case ordered for certification to the Indiana Supreme Court from the United States Court of Appeals, Seventh Circuit, the plaintiff appealed from the grant of the defendant's motion for summary judgment. The district court held the plaintiff's products liability action, filed one year and three months after the injuries to her decedent but more than fourteen years after the allegedly defective product was placed in the stream of commerce, was barred by the Indiana Products Liability Act's statute of limitations, which read in relevant part: "[A]ny product liability action must be commenced within two years after the cause of action accrued *or* within ten years after the delivery of the product to the initial user or consumer; . . . ." 418 N.E.2d at 209–10 (quoting IND. CODE 33–1–1.5–5 (Supp.1978)) (emphasis added). The plaintiff argued the legislature's use of the disjunctive "or" clearly indicated an intent to provide two alternative periods of limitation. Despite the apparently clear effect of the disjunctive, the supreme court construed the limitations periods as conjunctive, stating:

"In construing an Indiana statute, our duty is to ascertain and give effect to the intent of the legislature. In doing so, we must give meaning to the language used, where that meaning is clear and unambiguous. Where the *meaning of the statute* is ambiguous, however, or where one or more constructions are apparently possible, we must construe the statute so as to arrive at the apparent intention of the legislature which is consistently revealed in all sections of the act, and consistent with all other statutes passed by the legislature."

418 N.E.2d at 210 (emphasis added.)

Finally, in *Allen County Department of Public Welfare v. Ball Memorial Hospital Association, Inc.,* (1969) 253 Ind. 179, 252 N.E.2d 424, the plaintiff-hospital sued the defendant-department of welfare to recover the cost treatment of an indigent patient pursuant to a statute that required the cost of hospital care of an indigent person to be borne by the indigent's county of legal residence. *See* Burns' Ind.Stat.Anno. § 52–1146 (Supp.1969) (present version encoded at IND.CODE 12–5–6–6). The welfare department defended on the basis of the hospital's failure to meet the following requirement of the statute: "[A]ny hospital to which such indigent person is admitted for care ... *shall* within seventy-two [72] hours, not counting holidays or weekends, report such matter to the department of public welfare of the county in which the person is injured or becomes ill." 253 Ind. at 183, 252 N.E.2d at 426 (quoting Burns' § 52–1146, *supra*) (emphasis supplied). The welfare department argued that the hospital's failure to comply with the mandatory 72-hour notice requirement was fatal to its claim against the department. Our supreme court held, however, that the apparently clear and mandatory language of the statute was actually merely directory in nature, and that the hospital's failure to comply with the time restrictions of the notice procedure did not preclude the hospital's recovery. In so holding, the court stated:

"In construing the statute before us we must be mindful that the intent of the legislature controls. In this situation our judicial function is best discharged by an honest and earnest desire to ascertain and effectuate that intent. *State v. Gilbert* (1966), 247 Ind. 544, 219 N.E.2d 892.

The meaning and intention of the legislature are to be ascertained not only from the phraseology of the statute but also by considering its design, its nature and the consequences that flow from the various interpretations.

. . . .

Our role in construing this statute is well stated in Crawford, Statutory Construction § 261, p. 516:

'In other words, the court will determine whether a particular provision must be followed. It will do this, even though the statute on its face is clear, just as it will determine whether an unambiguous statute will include or exclude a given case from its operation if construed strictly or liberally. * * * Both are used to avoid a strict and literal adherence to the letter and form of a statute in order that the statute may produce no absurd or mischievous results. * * * And, of course, the justification for this attitude is found in the maxim that it is presumed that the legislature does not intend to enact a law which will operate absurdly or mischievously. Consequently, in avoiding such results, the court is actually giving effect to the legislative intent.'"

253 Ind. at 184–85, 252 N.E.2d at 427.

As the cases above instruct, it is not the clarity or ambiguity of the words used in a statute that determine whether judicial construction of the statute is appropriate; rather it is the clarity or ambiguity of *the meaning* those words give to the statute as a whole. We hold the Medical Malpractice Act is ambiguous and unclear in meaning as to whether a claim for premises liability by a patient against a qualified health care provider is within the scope of the Act. As such we must seek the intention of the legislature in passing the Act in

order to give it proper construction to accomplish the end it was enacted to attain. *Wilfong v. Indiana Gas Co.*, (1980) Ind. App., 399 N.E.2d 788, 791.

### Legislative Intent

Winona contends that the legislative purpose in enacting the Medical Malpractice Act was to control "the overwhelming potential financial liability arising out of the patient/health care provider relationship." Appellant's Brief at 10. In Winona's view, all that is necessary for the application of the Act is that the parties stand in the relationship of patient and qualified health care provider. Lomax, however, views the purpose of the Act more narrowly, arguing that the legislature intended to control the potential liability of health care providers only for what Lomax terms "classic" medical malpractice, i.e., "the negligent rendition or failure to render professional medical and hospital care." Appellee's Brief at 7–8.

The historical background leading to the enactment of the Medical Malpractice Act in 1975 is an appropriate place to begin in ascertaining the legislative purpose behind the Act. In the early 1970's, the problem of expensive medical malpractice insurance, which had been simmering for over a decade, came to a boil and threatened to make such insurance completely unavailable. *See* Note, *A Study of Medical Malpractice Insurance: Maintaining Rates and Availability,* 9 IND.L.REV. 594 (1976); Note, *The Indiana Medical Malpractice Act: Legislative Surgery on Patients' Rights,* 10 VAL.U.L.REV. 303 (1976). In *Johnson v. St. Vincent Hospital,* (1980) 273 Ind. 374, 404 N.E.2d 585, upon which both Winona and Lomax rely, our supreme court affirmed the constitutionality of the Indiana General Assembly's response to this nationwide problem, the Medical Malpractice Act. In upholding the Act, the court surveyed the conditions that spurred its enactment:

"In the Mansur case [one of the four cases consolidated before the court for argument and opinion] a great deal of proof descriptive of the conditions in the health care and insurance industries which gave rise to the Act was brought forth and developed at a trial for constitutional purposes. Immediately prior to its enactment seven of the ten insurance companies writing the majority of medical malpractice insurance policies in the State ceased or limited writing such insurance because of unprofitability or an inability to calculate an adequate premium. Premiums had already increased as much as 1200 percent over a period of fifteen years because of the increase in the number and size of claims. Physicians practicing high risk specialties such as anesthesiology were hard pressed or totally unable to purchase insurance coverage. In some rural areas surgery was reported cancelled. Emergency services were discontinued at some hospitals. Health care providers had become fearful of the exposure to malpractice claims and at the same time were unable to obtain adequate malpractice insurance coverage at reasonable prices.

According to the Legislature's appraisal, these conditions implicated the vital interests of the community in the availability of the professional services of physicians and other health care providers. The Legislature responded with this Act in an effort to preserve those services and thereby to protect the public health and wellbeing of the community. It reflects a specific legislative judgment that a causal relationship existed at the time between the settlement and prosecution of malpractice claims against health care providers and the actual and threatened diminuation [sic] of health care services. The exceptionally high cost and even unavailability of malpractice insurance were major links in the relational chain. They in turn were connected through the large settlements and judgments being paid to patients. To the extent that these sums were excessive or unjustifiable, they had become so large because the processes by which evidence of negligent conduct was being gathered, evaluated, and used were faulty. Sub-

sidiarily, these sums were being unnecessarily increased because the habitually negligent health care providers were not being identified and dealt with, very large attorney fees were being charged, and the time limitations upon bringing malpractice actions were too long.

With these judgments as its basis the Act created voluntary state-sponsored liability insurance for doctors and other health care providers, created a patient compensation fund, took measures to prevent injuries to patients through the negligence of health care providers, and subjected negligence claims against health care providers to special controls limiting patient remedies."

404 N.E.2d at 589–90.

■ Despite the language at the end of this passage referring generally to "negligence claims against health care providers," it is clear from reading this passage *as a whole* that the Medical Malpractice Act was the legislative response to the crisis in the availability of medical malpractice insurance, which, in turn, was threatening the availability of health care services to the public. The supreme court's review of the historical background of the

Act does not indicate the legislature was aware of any difficulties of health care providers in obtaining general liability insurance coverage for ordinary non-medical accidents on their premises. No threatened unavailability of such insurance existed as a link in the relational chain to the threatened diminution of health care services. The legislature was responding only to a crisis in the ability of health care providers to obtain medical malpractice insurance coverage (which did not cover non-medical accidents) and thus to continue providing health care services to the public.[6] *See Sue Yee Lee*, 410 N.E.2d at 1324.

Thus, the conditions that were the impetus for the legislature's enactment of the Medical Malpractice Act had nothing to do with the sort of liability any health care provider—whether a hospital or a private practitioner—risks when a patient, or anyone else, is injured by the negligent maintenance of the provider's business premises. That not being the sort of liability that brought about passage of the Act, it is absurd to believe the legislature would have reached out to restrict such liability by including it within the Act.[7]

6. To the extent that the coverage of medical malpractice insurance policies is defined by the terms of the Medical Malpractice Act, an interpretation of the Act that holds premises liability claims to be covered by the Act would operate directly contrary to the clearest purpose of the Act—to preserve the availability of health care services by guaranteeing the continued availability of medical malpractice insurance—by placing within the coverage of medical malpractice insurance many claims presently covered by general liability insurance.

7. *See generally, The 1975 Indiana Medical Malpractice Act*, 51 IND.L.J. 91 (1975). The following articles in this Symposium, due to the unique positions held by their authors, are of particular interest: Gray, *The Insurer's Dilemma*, 51 IND.L.J. 120 (1975); Segar, *Is Malpractice Insurable?* 51 IND.L.J. 128 (1975); Stewart, *The Malpractice Problem—Its Cause and Cure: The Physician's Perspective*, 51 IND.L.J. 134 (1975). These articles are especially noteworthy because the authors were members of a congress of attorneys who "undertook to draft remedial legislation for the consideration of the legislature. Implicit in the decision to undertake this project was the conviction that remedial legislation was essential to the preservation of

the health care system." Stewart, *supra*, at 136. Apparently these attorneys were enlisted in this effort by the newly elected president of the Indiana State Medical Association, Dr. Gilbert Wilhelmus. *See id.* Thus, the three articles cited above reflect not only the perceptions of the original drafters of the Medical Malpractice Act, but also the perspective of the medical malpractice "crisis" held by the professional regulatory body of the physicians of this state.

It cannot be said that any of these authors indicated a concern for the need to protect health care providers from any sort of liability other than that which can arise when a physician supplies treatment to a patient. Certainly, there is nothing in these articles to suggest that the attorneys who drafted the remedial legislation meant to recommend to the legislature that they protect health care providers from the sort of liability they might incur under a general liability insurance policy due to negligent maintenance of their premises. *See* Gray, *supra*, at 124–25. It would be difficult to believe that the legislature, given the recommendation of representatives of practitioners in the medical profession regarding how to limit the health care providers' liability to preserve the availability of health care services, nevertheless intended to go

That the legislature did not intend to include such claims as Lomax's within the Act is further supported by the design and procedures of the Act. As Lomax points out above, the provisions of IC 16–9.5–9–7, charging the medical review panel with the sole duty of expressing its expert opinion on whether the defendant acted within the appropriate standard of care, and IC 16–9.-5–9–9, mandating the admissibility of that opinion in the claimant's subsequent court action, would conflict with well-established principles of Indiana evidence law if applied to a claim such as Lomax's. Such matters as the maintenance of reasonably safe premises are within the common knowledge and experience of the average person. Health care providers, who must make up the medical review panel under IC 16–9.5–9–3, are no more qualified as experts on such matters than the average juror. And as we have stated: "When ... the matters at issue are within the common knowledge and experience of the jury, expert testimony regarding the exercise of reasonable care is improper and should be excluded." *Emig v. Physicians' Physical Therapy Service, Inc.*, 432 N.E.2d at 53 (citing *Rosenbalm v. Winski*, (1975) 165 Ind.App. 378, 332 N.E.2d 249). Thus, the consequences that flow from the interpretation of the Act argued for by Winona lead to a conflict with established law of evidence. It is presumed the legislature did not intend such a problematic result. *See Allen County Department of Public Welfare, supra.*

Thus, in examining the historical background leading to the enactment of the Medical Malpractice Act and the legislature's design of the Act, two important factors relevant to the legislative intent behind the Act become clear. First, the underlying problem that confronted the legislature at the time it passed the Act was the extremely high cost of medical malpractice insurance, which threatened the continued availability of health care services because the providers of such services were forced either to pay exorbitant malpractice insurance premiums or to provide care and treatment without insurance or to refuse to provide treatment at all. There is no indication in the background of the Act that health care providers had any problem obtaining the sort of general liability insurance that would cover a premises liability claim such as Lomax's or that the legislature was concerned with any such problem. Secondly, the system designed by the legislature to solve the medical malpractice insurance problem, if applied to a claim such as Lomax's, creates conflicts with established Indiana law of evidence, and there is no indication the legislature intended to overrule the established law.

Given these considerations, it seems clear the legislature did not intend a premises liability claim such as Lomax's to come within the coverage of the Act.[8] Nevertheless, this court expressed an apparently contrary view in *Methodist Hospital of Indiana, Inc. v. Rioux*, (1982) Ind.App., 438 N.E.2d 315. It is to that opinion we now must turn.

### The Rioux Decision

The crux of the issue raised by the *Rioux* decision can best be introduced by quoting the critical segment of our opinion in that case:

> "The complaint alleges that the hospital negligently and carelessly failed to provide appropriate care for the patient during her confinement to prevent her fall and injury. This falls within the broad language of the statute.[2]

---

further and include within the Act premises liability claims that were never perceived as part of the threat to the availability of health care services. We do not believe the legislature intended the Act to go this far.

**8.** We recognize that the question of whether a particular claim falls within the Act is extremely fact sensitive and that a broad band of gray lies in the middle of the spectrum from pure medical malpractice to ordinary non-medical negligence. However, given the apparent legislative purpose of the Medical Malpractice Act, we believe that litigants will not be led astray if they consider whether the claim in question is one that medical malpractice insurance reasonably would be expected to cover, or whether another type of insurance would cover the claim.

When the hospital filed its Motion for Summary Judgment [footnote omitted] with accompanying affidavit demonstrating no medical review panel opinion had been rendered, Riouxes did nothing to place in issue facts to take the complaint out of the Act. When a motion for summary judgment is made and supported as provided in T.R. 56, an adverse party may not rest upon his pleadings but must, as provided by the rule, set forth facts showing there is a genuine issue for trial. T.R. 56(E). In their memorandum in opposition, Riouxes claim the negligence was of a non-medical nature removing them from the Act. However, the complaint places in issue appropriate care by the hospital during confinement which is subject to the Act. Statements of fact in the memorandum in opposition cannot be relied upon to demonstrate genuine issues of fact. *Bell v. Horton,* (1980) Ind.App., 411 N.E.2d 648.

There is no genuine issue of material fact presented. The Act is drafted in very broad terms as shown by the definitions set out above. Applying the definitions of the Act, filing a proposed complaint and an opinion of the medical review panel were necessary prerequisites to filing suit in the trial court. Hence, summary judgment was appropriate and should have been granted. The trial court erred in its application of the law to the facts and the legal issue before it. We must reverse and remand for proceedings consistent with this opinion."

[2. Because of the broad language used by the Legislature, we believe the Act was intended to control the situation before us. The Act does not appear to be in need of construction. Methodist Hospital is a hospital facility authorized to provide professional services and health care. It is the professional duty of a hospital to provide a safe environment within which to diagnose and treat patients. Failure to keep the hospital premises in a safe condition is a breach of the duty of a hospital. *Murillo v. Good Samaritan Hospital,* (1979) 99 Cal.App.3d 50, 160 Cal.Rptr. 33. Thus by definition, the injury or damage complained of falls within the Act. Ind.Code 16-9.5-1-1.]

438 N.E.2d at 316-17. On these grounds, the trial court's denial of the hospital's motion for summary judgment was reversed.

Winona contends *Rioux* is "four square" on the facts and determinative of the present case. To support this argument, Winona quotes from the appellate brief filed by the plaintiffs in *Rioux,*[9] wherein the plaintiffs charged the hospital with "negligence in failing to properly maintain the floor of the bathroom where Mrs. Rioux fell," and disclaimed that their action was one for medical malpractice. Appellant's Brief at 16. Lomax argues *Rioux* was decided solely on the allegation in the complaint that the hospital "negligently and carelessly failed to provide appropriate care ... to prevent said fall and injury." Appellee's Brief at 16-17, quoting 438 N.E.2d at 316. Thus, Lomax contends that, whatever the plaintiffs in *Rioux* may have claimed in their brief regarding the condition of the hospital floor, it was not properly before this court, and that *Rioux* is thus distinguished from the present case.

Lomax is correct, as should have been clear from our holding that statements of fact in a memorandum in opposition to a motion for summary judgment (or in an Appellee's Brief, for that matter) cannot be relied upon to create a genuine issue of fact sufficient to withstand the motion. *Rioux* was decided only on the allegation of failure of appropriate care as charged in the complaint. This court had no evidence *properly before it* to remove that allegation from the coverage of the Act.

Here, however, Lomax did two things that the plaintiffs in *Rioux* failed to do that removed this complaint from the coverage of the Medical Malpractice Act and saved her from an adverse summary judgment. First, she alleged in her complaint more than a mere failure of "appropriate care" on the part of Winona; rather, she alleged,

9. The law firm that represented the defendant hospital in *Rioux* also represents Winona in the present appeal.

in what is clearly and unambiguously a premises liability claim, that "she fell as a proximate result of defendant's negligent maintenance of the floor ... in allowing a broken board to stick up in said floor ...." R. 2. Unlike the complaint in *Rioux*, this cannot possibly be construed as alleging the sort of negligence that the Medical Malpractice Act was intended to cover.

Secondly, unlike the plaintiffs in *Rioux*, Lomax did not simply rest on her pleadings in the face of Winona's motion for summary judgment supported by affidavit. Rather, Lomax filed an affidavit of her own that showed she was unattended by any of Winona's employees at the time of her fall, i.e., she clearly was not receiving care or treatment at that time. This served to further clarify that her claim was not within the coverage of the Act. The *Rioux* plaintiffs' failure to present such evidence on the record in a form allowed for by the Trial Rules left this court with no option but to hold that the trial court should have granted the hospital's motion for summary judgment pursuant to Trial Rule 56(E).

## CONCLUSION

A premises liability claim by a patient against a health care provider, such as Lomax's claim against Winona, is not within the coverage of the Medical Malpractice Act. Anything in *Rioux* to the contrary is dicta and does not control this case. Thus, we hold that the trial court properly determined that Lomax was entitled to partial summary judgment.

Affirmed.

CONOVER, P.J., and YOUNG, J., concur.