**Nathan DOVE, by his parents and natural guardians, Debra DOVE and David Dove, Appellants,**

v.

**Jerard G. RUFF, M.D., Appellee.**

No. 53–A04–8906–CV–240.

Court of Appeals of Indiana, Fourth District.

Aug. 14, 1990.

Rehearing Denied Sept. 24, 1990.

Stephen B. Caplin, Brian K. Hugen, Caplin and Hugen, Denver, Colo., Stephen B. Caplin, Stephen B. Caplin, P.C., Indianapolis, for appellants.

Len E. Bunger, William K. Steger, Bunger, Robertson, Kelley and Steger, Bloomington, for appellee.

MILLER, Presiding Judge.

Nathan Dove (age 10) was a patient of defendant-appellee Jerard G. Ruff, M.D., an allergist. In treating Nathan for allergies, Dr. Ruff sold Nathan's parents (the Doves) an injectable medication which he prepared (his own combination of solutions obtained from ethical pharmaceutical companies) to be administered by a licensed practical nurse.[1] The medication was delivered in a vial, containing more than one dose, and there was a separate charge of

$24.00 for the medication. On or about October 8, 1984, Nathan suffered a severe anaphylactic reaction after receiving an injection of the drug, which caused serious and irreversible brain damage. Nathan's parents filed an action against Dr. Ruff in three counts—products liability, strict liability in tort, and breach of warranty on a theory that Dr. Ruff compounded, manufactured, dispensed and sold a drug product that was in a defective condition and unreasonably dangerous.[2] Dr. Ruff moved for summary judgment on the grounds that these claims were covered under the Indiana Medical Malpractice Act, Ind.Code 16–9.5–1–1 *et seq.* The trial court granted summary judgment for Dr. Ruff and the Doves appeal raising several issues which we have combined and restated:

> Whether there are any genuine issues of material fact that Dr. Ruff was not practicing medicine when he compounded and dispensed the medication to Nathan Dove, making summary judgment inappropriate.

We affirm because we find that Dr. Ruff was acting within the scope of the practice of his medical specialty, an allergist, when he compounded and dispensed the medication and that any acts of negligence in the performance of those functions properly fall within the scope and purpose of the Indiana Medical Malpractice Act.

DECISION

The Doves contend the trial court erred in entering summary judgment because torts arising from compounding and dispensing of drugs are outside the practice of medicine and therefore are not covered by the Malpractice Act. They argue that the scope of the practice of medicine is narrowly delineated by the statutory definitions of the practice of medicine under I.C. 25–22.5–1–1 and the practice of pharmacy I.C. 25–26–13–2.

---

1. Normally Dr. Ruff prepared the medication to be injected by a member of his staff at his office. However, the Doves requested that they be permitted to take the medication to a different nurse for injection.

2. A claim was also filed under the Indiana Medical Malpractice Act which was pending at the time the briefs were filed.

I.C. 25–22.5–1–1.1(a) "Practice of medicine or osteopathic medicine" means any one (1) or a combination of the following:

(1) Holding oneself out to the public as being engaged in:

(A) the *diagnosis, treatment, correction,* or prevention of any disease, ailment, defect, injury, infirmity, deformity, pain or other condition of human beings;

(B) the suggestion, recommendation or prescription or *administration of any form of treatment, without limitation;*

(C) the performing of any kind of surgical operation upon a human being, including tattooing, or by any means, for the intended palliation, relief, cure; or

(D) the prevention of any physical, mental, or function, ailment or defect of any person ... (pertinent part, emphasis added)

The Doves contend that because the "compounding and dispensing" of drugs is not specifically authorized by the descriptive terminology of the practice of medicine, it necessarily constitutes the unauthorized practice of pharmacy if undertaken by a physician. We agree with Dr. Ruff that the statutory definitions are descriptive, but not all encompassing and that there can be overlap in the responsibilities. The words "without limitation" underscored above suggest that the definition of a physician's responsibilities is not limited to those specifically set out.

■ The Indiana Legend Act thusly defines a "Manufacturer":

(f) "Manufacturer" means a person who by compounding, cultivating, harvesting, mixing, or other process, produces or prepares legend drugs and includes persons who prepare such drugs in dosage forms by mixing, compounding, encapsulating, entableting, or other process, or who packages or repackages such drugs, but *does not include pharmacists,* or *practitioners in the practice of their profession.*

I.C. 16–6–8–2(f).

A practitioner is defined as "a physician holding an unlimited license to practice medicine and surgery in this state." I.C. 16–6–8–2(b)(1). We find this language, when read in conjunction with the responsibilities of a physician under I.C. 25–22.5–1–1, indicates that the legislature did consider that a physician might also engage in some activities which might be considered "manufacturing" under most circumstances but are not considered to be manufacturing (or the practice of pharmacy) when a physician performs the acts while properly engaged in the practice of medicine.

■ Dr. Ruff also argues that the medication was not a product meant for inclusion within Indiana's Product Liability Act. I.C. 33–1–1.5–2 defines product to mean:

... any item or good that is personalty at the time it is conveyed by the seller to another party. *It does not apply to a transaction* [3] *that, by its nature, involves wholly or predominantly the sale of a service rather than a product.* (emphasis added).

By its nature, the practice of medicine is primarily a service, but there are times when goods are provided to patients incidental to the delivery of health care services. The providing of such goods does not normally remove the health care professional from the protection of the Malpractice Act. The incidental furnishing of supplies or equipment during the course of medical treatment does not create a buyer-seller relationship between a patient and his physician which could give rise to an implied or express warranty. See generally 61 Am.Jur.2d Physicians, Surgeons § 204 (1981). In order for there to be liability under a theory of strict liability, the seller of the product must be engaged in the business of selling that item. *Id;* I.C. 33–1–1.5–2, *supra.*

■ In *Carmichael v. Reitz* (1971), 17 Cal.App.3d 958, 95 Cal.Rptr. 381, the appel-

**3.** The Doves contend the underscored language refers to I.C. 16–9.5–1–1(a)(3) which classifies the processing and sale of blood as a service and under the protection of the Malpractice Act, but cite no authority to support their position that the language refers *only* to transactions involving the sale of blood.

late court concluded that a physician treating and diagnosing a patient is not generally selling a product, but is selling his services as a healer. Although that case involved a physician who *prescribed* a medication, and not a physician who mixed different solutions to form a specific injectable medication for his patient, we believe the reasoning of the court applies in this situation as well. The California court observed:

"The physician's services depend upon his skill and judgment derived from his specialized training, knowledge, experience and skill. The physician prescribes the medicine in the course of chemotherapy *only* as a chemical aid instrument to achieve a cure." *Id* at 979, 95 Cal.Rptr. at 393.

Here, the facts show the Doves took Nathan to Dr. Ruff for treatment of Nathan's allergies. When Dr. Ruff mixed and provided a medication for Nathan, he was performing an act which can properly be characterized as "administration of [a] form of treatment" authorized under the statutory definition of the practice of medicine (I.C. 25–22.5–1–1.1, *supra*). As in *Carmichael,* it is the physician's skill, judgment, specialized training and experience which was sought by the Doves and utilized by Dr. Ruff in preparing an individualized mixture to alleviate or cure Nathan's allergy symptoms. The fact that there may have been a separate notation or charge on the billing statement for the medication does not mean the sale of the medicine was a separate transaction.[4] Here, the sale was incidental to the delivery of medical services.[5] See *Preston v. Thompson* (1981), 53 N.C.App. 290, 280 S.E.2d 780, which held that a dentist who prepared and sold dentures to his patient

was not a merchant, the dentures were not goods under the Uniform Commercial Code. The dentist was liable, if at all, only under malpractice theory and not under breach of warranty or products liability theories.

The Doves further argue that health care providers can commit many different classes of torts and that only when acting as a "health care provider" will a physician's acts fall under the Medical Malpractice Act. They cite *Collins v. Thakkar* (1990), Ind.App., 552 N.E.2d 507, wherein this court observed that the Malpractice Act "concerns itself with the behavior or practices of a physician acting in his professional capacity as a provider of medical services. Conversely, acts or omissions of a health care provider unrelated or outside the provider's role as a health care professional are not the Act's aim." 552 N.E.2d at 510.

*Collins* is distinguishable from the present case on its facts. In *Collins,* a former patient of Dr. Thakkar's filed a complaint against him on theories of wrongful abortion, assault and battery, and intentional infliction of emotional distress. Collins alleged that, after becoming Thakkar's patient, they developed a social relationship involving periodic sexual intercourse. When Collins thought she was pregnant, she consulted Thakkar, who agreed to examine her *after ordinary office hours* for the purpose of determining whether she was pregnant. Collins alleged that during the examination, without her consent and over her protest, Thakkar did some act with a metal instrument inside her, inflicting excruciating pain. The trial court dismissed the complaint for lack of jurisdiction because the allegations in the complaint fell within the scope of the Mal-

4. It is undisputed that Dr. Ruff provided a billing which broke down charges for his services into various component parts, which included a separate notation for the medication. This is not surprising because insurance companies usually require a breakdown of charges for determining coverage.

5. *See Data Processing v. L.H. Smith Oil Corp.* (1986), Ind.App., 492 N.E.2d 314, at 319, where Judge Conover, writing for the majority, found

the contract for a sale of a computer program, although including *incidental tangible goods* such as floppy disks, hard disks or magnetic tape, was not a "good" as defined under the Uniform Commercial Code. The predominant factor was the sale of a service—the skill and knowledge of the programmer. Judge Conover analogized that situation to that of client seeking advice from an attorney or a patient seeking medical treatment.

practice Act. Collins appealed the dismissal because she claimed Thakkar, although a physician, was not rendering health care or professional services. This court reversed the trial court's dismissal. Judge Robertson, writing for the majority in *Collins*, observed the language of the Malpractice Act suggests that health care covered under the act relates to conduct performed "in the interest of or for the benefit of the patient's health, i.e. conduct engaged in by a physician which is curative or salutary in nature or effect. Acts or practices committed with something other than a remedial purpose would be excluded by implication." *Id.* at 510. In *Collins*, there is a question as to whether Thakkar acted as a physician (treating a patient) or whether his acts were performed outside the doctor/patient relationship. In the present case, however, it is not disputed that Dr. Ruff's actions were performed with remedial intent. Thus, it cannot be said Dr. Ruff was acting outside his professional capacity.

The additional cases which the Doves cite all deal with premises liability issues. *Winona Memorial Foundation v. Lomax* (1984), Ind.App., 465 N.E.2d 731 (patient changing clothes in dressing room preparatory to receiving therapy tripped and fell); *Methodist Hospital of Indiana, Inc. v. Rioux* (1982), Ind.App., 438 N.E.2d 315 (patient fell out of hospital bed); *Methodist Hospital of Indiana, Inc. v. Ray* (1990), Ind.App., 551 N.E.2d 463 (patient contracted legionnaires disease while hospitalized). In *Lomax, supra,* this court explained the difference between "health" care and maintenance of safe premises:

> *[A]s a whole*[,] ... the Medical Malpractice Act was the legislative response to the crisis in the availability of medical malpractice insurance, which, in turn, was threatening the availability of health care services to the public. The supreme court's review of the historical background of the Act does not indicate the legislature was aware of any difficulties of health care providers in obtaining general liability insurance coverage for ordinary non-medical accidents on their premises. No threatened unavailability of such insurance existed as a link in the relational chain to the threatened diminution of health care services. The legislature was responding only to a crisis in the ability of health care providers to obtain medical malpractice insurance coverage (which did not cover non-medical accidents) and thus to continue providing health care services to the public. [Citations omitted]. (emphasis added)

465 N.E.2d at 739.

We cannot accept premises liability cases as authority to decide this case. The present case does not involve premises liability. The critical question here is whether the doctor was liable because of his acts in providing health care and, as we noted earlier, Dr. Ruff was acting in his professional capacity.

■ We observe that the malpractice insurance coverage carried by Dr. Ruff does include as an insured peril the combining of medications to be used in the treatment of his patients. This at least is some indication that the medical profession and insurance industry regard Dr. Ruff's acts as within the practice of his medical specialty. While we are not bound by what the insurance company or a doctor or a group of doctors think the *law* is, we look to expert testimony to define whether a physician is acting with the skill and care of a physician practicing that specialty. *Methodist Hospital v. Ray, supra,* at 468.

Under the facts of this case, we find that when Dr. Ruff prepared the medication for injection he was acting within the scope of his practice of medicine as an allergist and, therefore, his actions administering the medication, including the preparation of the mixture and any failure to give warnings of side effects, necessarily fall within the scope of the Indiana Malpractice Act. As the trial judge observed in granting the motion for summary judgment:

> "The practice of medicine may be said to consist of three things: First, in judging the nature, character, and symptoms of a disease; second, in determining the proper remedy for the disease; third, in giving or prescribing the application of the remedy to the disease. *Fowler v.*

*Norways Sanitorium* (1942), 112 Ind. App. 347, 42 N.E.2d 415. It therefore follows that the defendant was acting in his capacity as a physician when he provided a remedy to the plaintiff." (R.105).

We find there is no genuine issue of a material fact and that summary judgment was proper under the facts and the circumstances of this case.

Judgment affirmed.

CONOVER, J., concurs.

SULLIVAN, J., concurs with opinion.

SULLIVAN, Judge, concurring.

With two exceptions, I fully concur in the majority opinion.

I am unable to agree that in *Collins v. Thakkar* (1990) 1st Dist. Ind.App., 552 N.E.2d 507, *trans. pending,* there was a genuine issue as to whether Thakkar was acting as a physician or whether his acts were performed outside the doctor-patient relationship. Here, as in *Collins,* the acts were clearly within the scope of the Medical Malpractice Act. For this reason I see no basis for distinction.

The majority alludes to the malpractice insurance policy as indicative of the view that "the medical profession and insurance industry regard [the] acts as within the practice of [the] medical specialty." Opinion at 840. In my view, such is wholly irrelevant to the issues before us and does not bear upon whether or not the particular conduct did or did not constitute the practice of medicine within the contemplation of the statutory language.

Subject to these observations, I fully concur.