Austin H. HARTS, Appellant (Plaintiff),

v.

CAYLOR–NICKEL HOSPITAL, INC., Appellee (Defendant).

No. 05A02–8907–CV–323.

Court of Appeals of Indiana, Second District.

May 10, 1990.

Rehearing Denied Aug. 7, 1990.

Ronald E. James, Benson, Pantello, Morris & James, Fort Wayne, for appellant.

John F. Lyons, John D. Walda, Barrett & McNagny, Fort Wayne, for appellee.

BUCHANAN, Judge.

## CASE SUMMARY

Plaintiff-appellant Austin H. Harts (Harts) appeals from the grant of Caylor–Nickel Hospital's (Caylor–Nickel) motion for judgment on the evidence after the trial court concluded that it lacked subject matter jurisdiction over the case.

We reverse and remand with instructions that the jury's verdict be reinstated.

## FACTS

On February 18, 1985, Harts, then aged 77, was admitted to Caylor–Nickel for upper gastrointestinal distress. Two days later while lying in his hospital bed, Harts attempted to turn himself from his back to his left side. As Harts moved, he reached for the bed rail with his right hand, but the railing "was not there." As a result, Harts fell from the bed and broke his hip. That fall also aggravated an earlier hip injury Harts had sustained. During Harts' stay at the hospital, the only people who had raised or lowered the bed rails were Caylor–Nickel personnel. Harts had no visitors on the day of the fall other than the staff of Caylor–Nickel.

Harts filed a complaint on January 26, 1987, alleging that Caylor–Nickel was negligent and that its negligence proximately caused the fall. At various times throughout the proceedings, Caylor–Nickel moved for judgment on the evidence or summary judgment, alleging that the trial court lacked jurisdiction over the case because Harts had not initially presented his case to a Medical Review Panel as required by Ind.Code 16–9.5–1–1 –10–5 (1988) (Medical Malpractice Act). When Caylor–Nickel made its final motion at the conclusion of all the evidence, the trial court held its decision in abeyance pending the jury's verdict.

The jury returned a verdict for Harts awarding him $25,000 in damages and concluded that Caylor–Nickel was seventy-five percent at fault and Harts was twenty-five percent at fault, thereby reducing the verdict to the sum of $18,750.

On November 16, 1988, Caylor–Nickel filed another motion for judgment on the evidence, and on March 16, 1989, the trial judge set aside the jury's verdict and entered the following order which provided in pertinent part:

"1. That on the 23rd day of March, 1988, the Defendants, Caylor–Nickel Hospital, Inc., and Caylor–Nickel Medical

Center, Inc., filed a Motion for Summary Judgment.

2. That the basis for the motion for summary judgment was that the plaintiff had not pursued his appropriate remedy pursuant to the Indiana Medical Malpractice Act, and as a result thereof, this Court lacked jurisdiction to proceed.

3. That the Defendants contended that the Medical Malpractice Act made it mandatory that the plaintiff first must have submitted a Proposed Complaint to the Insurance Commissioner for a review and opinion from the Medical Review Panel as a condition precedent to the filing of the lawsuit.

.   .   .   .   .

7. That the evidence at the trial indicated the following facts:

A. That the plaintiff was a patient at the Caylor–Nickel Hospital.

B. That the plaintiff was in his bed.

C. That a nurse had put the safety rails in an up position.

D. That pursuant to the plaintiff, he attempted to turn over in bed and placed his hand on one of the side rails for support and the rail collapsed causing him to fall out of bed causing injuries to his hip.

E. That pursuant to the testimony of one of the nurses, the plaintiff must have pulled himself over the side rail and then fell to the floor because she believed the side rail was still in the up position after the incident occurred.

F. That there were no mechanical defects in either the side rail or the bed that would cause the side rail to fall.

8. That the plaintiff contends that the raising and lowering of bed safety rails is merely a ministerial function, that could be performed by any individual, and consequently falls outside the purview of the Medical Malpractice Act.

9. That the Plaintiff in this case is proceeding under the theory of premises liability.

10. That both the plaintiff and the defendant cite the case of *Winona Memorial Foundation vs. Lomax,* (1984) 465 N.E.2d 731, as the controlling case in this cause of action.

11. That the Appellate Court, in the *Winona case,* determined that not all negligent acts of medical health providers fell within the purview of the Indiana Medical Malpractice Act, and consequently, in the area of premises liability, it was not necessary for a plaintiff to first present his claim to the Medical Review Panel.

12. That at the conclusion of the plaintiff's case in chief at the jury trial in the cause of action, the defendant filed a Motion for Judgment on the Evidence again raising the same issue as the defendants' had done in their motion for summary judgment which had been denied by the Court.

13. That at the conclusion of the plaintiff's evidence in chief, after hearing oral arguments on the defendants' motion for judgment on the evidence or in the alternative, summary judgment, the Court denied the motion, however, the Court advised the parties that it would again reconsider said motion at the conclusion of the evidence in the case.

14. That at the conclusion of the evidence at the jury trial, the defendant again renewed its motion for judgment on the evidence and the Court made the following findings at that time:

A. That the motion for judgment on the evidence pertains to the defendants' motion for summary judgment pursuant to the provisions of Indiana code 16–9.5–2–1.

B. That after hearing all of the evidence in the case, the Court believes that the defendants' motion does have merit.

C. That both parties rely upon the case of *Winona Memorial Foundation vs. Lomax,* (1984) 465 N.E.2d 731.

D. That the plaintiff is proceeding with the legal theory of premises liability and believes that the fact situation in the *Winona case* are reasonably similar to the facts in this cause of action.

E. That the plaintiff requests that the Court continue to a final verdict due to

the fact that all of the evidence has been presented to a jury and also based upon the fact that the plaintiff is 80 years of age, not in good health, with a reasonable chance that he would not survive the length of time that it would take to perfect an appeal and, if successful, retrial of this cause of action.

F. That the court, at this time, denies the defendants' motion for judgment on the evidence at the conclusion of the presentation of evidence in this cause of action, however, the court will again review the evidence after the Jury's verdict is presented to the Court in this cause of action.

15. That the Jury returned a verdict in favor of the plaintiff determining that the comparative fault of the defendant was seventy-five percent (75%) and that the plaintiff's total damages were in the sum of $25,000.00 resulting in a verdict in favor of the plaintiff in the sum of $18,750.00.

16. That upon the request of the attorney for the defendant, the Court did not enter judgment based upon the Jury's verdict, but advised the parties that it would withhold entering the judgment until the parties could present further oral arguments in regards to the defendants' motion for judgment on the evidence.

.     .     .     .     .

19. *That the defendants' motion for judgment on the evidence should be granted solely due to the fact that this cause of action falls within the purview of the Medical Malpractice Act and that this Court is without jurisdiction to proceed until such time as this case is presented to the Medical Review Panel for their determination.*

20. That this Court does not disagree with the verdict of the Jury, however, the decision of this Court to grant the defendants' motion for judgment is based solely upon the issue of jurisdiction."

*Record* at 202–06 (emphasis supplied).

## ISSUE

Harts presents the following issue for our review:

Did the trial court err when it set aside the jury's verdict based on the conclusion that it lacked subject matter jurisdiction because Harts failed to comply with the Indiana Medical Malpractice Act?

*PARTIES' CONTENTIONS*—Harts maintains that his claim was based upon "ordinary" negligence and therefore, he was not required to comply with the requirements of the Medical Malpractice Act.

Caylor–Nickel responds that the trial court properly granted its motion for judgment on the evidence because any claim of negligence against a health care provider is within the scope of the Medical Malpractice Act.

*CONCLUSION*—The trial court erred in granting Caylor–Nickels motion for judgment on the evidence when it determined that it lacked subject matter jurisdiction over this cause of action.

■ Before a medical malpractice action may be commenced in any court of this state against a health care provider, the Medical Malpractice Act requires that a proposed complaint be presented to a medical review panel and an opinion rendered by the panel. *Methodist Hosp. v. Ray* (1990), Ind.App., 551 N.E.2d 463; *Ogle v. St. John's Hickey Mem. Hosp.* (1985), Ind. App., 473 N.E.2d 1055, *trans. denied; Winona Memorial Foundation v. Lomax* (1984), Ind.App., 465 N.E.2d 731, *trans. denied; Methodist Hosp. of Indiana, Inc. v. Rioux* (1982), Ind.App., 438 N.E.2d 315; IC 16–9.5–9–2. The medical review panel reviews all proposed *malpractice* complaints against health care providers covered by the Act. *Ogle, supra; Rioux, supra.* However, this court has recognized that portions of the Medical Malpractice Act are ambiguous as to whether a claim for premises liability by a patient is within the scope of the Act. IC 16–9.5–1–1(h) defines malpractice as "any tort or breach of contract based on health care or professional services rendered, or which should have been rendered, by a health care provider, to a patient," and the Act also defines a tort as "any legal wrong, breach of duty, or negli-

gent or unlawful act or omission proximately causing injury or damage to another." IC 16–9.5–1–1(g).

In *Ogle*, this court determined that the plaintiff, a psychiatric patient in the defendant's hospital, was subject to the provisions of the Act when she was beaten and raped by another patient. In affirming the trial court's grant of summary judgment entered in favor of the hospital, we concluded:

> "The providing or not providing of suitable confinement for such a [psychiatric] patient can hardly be classed as anything other than a professional judgment based on medical knowledge under the terms of the Act as written. This is true even though the harm experienced was not another attempt at self-destruction. Proper limitations on exposure of a mentally ill patient to the public or to other patients is necessarily a medical judgment. The legislature expressly recognized that proper confinement is an act of medical care as it drafted the Health Care Definition section to encompass acts occurring during *'the patient's* medical care, treatment or *confinement.' "*

*Ogle, supra,* at 1059 (emphasis in original).

■ However, the Act is not so broad as to subject *every* patient-provider claim to its coverage. In *Lomax*, this court concluded that the plaintiff's claim was exempt from the Medical Malpractice Act when it was established that Lomax, a patient at the hospital, tripped and fell on a protruding floor board at a time when she was not under care or treatment of the medical staff.

Judge Miller writing for a unanimous court carefully reviewed the cases on this subject and explained the difference between "health care" and maintenance of safe premises:

> "[A]s a whole[,] ... the Medical Malpractice Act was the legislative response to the crisis in the availability of medical malpractice insurance, which, in turn, was threatening the availability of health care services to the public. The supreme court's review of the historical background of the Act does not indicate the legislature was aware of any difficulties of health care providers in obtaining general liability insurance coverage for ordinary non-medical accidents on their premises. No threatened unavailability of such insurance existed as a link in the relational chain to the threatened diminution of health care services. The legislature was responding only to a crisis in the ability of health care providers to obtain medical malpractice insurance coverage (which did not cover non-medical accidents) and thus to continue providing health care services to the public. [Citations omitted].
>
> Thus, the conditions that were the impetus for the legislature's enactment of the Medical Malpractice Act had nothing to do with the sort of liability any health care provider—whether a hospital or a private practitioner—risks when a patient, or anyone else, is injured by the negligent maintenance of the provider's business premises. That not being the sort of liability that brought about passage of the Act, it is absurd to believe the legislature would have reached out to restrict such liability by including it within the Act." ᴸ

*Lomax, supra,* at 739 (emphasis in original).

■ While Caylor–Nickel contends that *any* negligent act or omission by a health care provider to a patient constitutes malpractice within the scope of the Act, we rejected that argument in *Lomax* and determined that:

> "*Such matters as the maintenance of reasonably safe premises are within the common knowledge and experience of the average person. Health care providers, who must make up the medical review panel under IC 16–9.5–9–3, are no more qualified as experts on such matters than the average juror.* And as we have stated: 'When ... the matters at issue are within the common knowledge and experience of the jury, expert testimony regarding the exercise of reasonable care is improper and should be excluded.' *Emig v. Physi-*

cians' *Physical Therapy Service, Inc.*, 432 N.E.2d [52] at 53 (citing *Rosenbalm v. Winski*, (1975) 165 Ind.App. 378, 332 N.E.2d 249)."

*Lomax, supra,* at 740 (emphasis supplied).

Caylor–Nickel also maintains that the *Rioux* decision places Harts' claim within the scope of the Medical Malpractice Act. In *Rioux,* the plaintiff fell on the floor and broke her hip while a patient at Methodist Hospital. The *only* allegation raised in the complaint was that the hospital "negligently and carelessly *failed to provide appropriate care ... to prevent [her] fall and injury." Rioux, supra* at 316 (emphasis supplied). This court reversed the trial court's denial of the hospital's motion for summary judgment, determining that Rioux's claim fell within the broad language of the Medical Malpractice Act. *Lomax* distinguished *Rioux* on the grounds that the plaintiff *only* alleged that the hospital failed to render appropriate care. Rioux presented no other evidence that might have removed her claim from the scope of the Medical Malpractice Act.

Conversely, Lomax's complaint alleged more than a mere failure of appropriate care. She clearly pursued a premises liability claim contending that "she fell as a proximate result of defendant's negligent maintenance of the floor ... in allowing a broken board to stick up in said floor...." *Lomax, supra* at 742. Lomax did not simply rest on her pleadings after Winona filed its motion for summary judgment. She filed an affidavit stating that she clearly was not receiving care or treatment at the time of the fall. *Id.* The complaint that Harts filed alleged in relevant part that:

"3. On or about February 21, 1985 Plaintiff was a patient in the Caylor–Nickel Hospital Incorporated under the care of employees and agents of Caylor–Nickel Incorporated and Caylor–Nickel Medical Center, Incorporated.

4. While in the hospital on February 21, 1985 *the Plaintiff while turning in bed fell from his bed resulting in a fracture in his hip, aggravation of a pre-existing fracture, as well as other damages.*

5. *The direct and proximate cause of the fall of Plaintiff was the negligence of the Defendants."*

*Record* at 1 (emphasis supplied). Subsequently, Harts filed an affidavit which provided:

"1. I am the Plaintiff in this cause of action.

2. On February 21, 1985, I fell from a bed in Caylor–Nickel Hospital.

3. Prior to falling from the bed, I was attempting to turn over and tried to use the side guardrail which appeared to be up to assist me in turning.

4. As I turned and put my arm on the guardrail it gave way, causing my arm to fall and creating a momentum which pulled me off the bed and onto the floor.

5. I contend that the Defendant's employees failed to properly restrain or secure the side guardrail, and their negligence caused my fall.

6. At no time did anyone tell me that the guardrail was not secure or that it should not be used to help turn over.

7. I am not pursuing a claim for medical negligence arising out of this fall.

Further affiant sayeth naught.

/s/ Austin H. Harts"

*Record* at 33.

The tenor of Harts' complaint taken as a whole clearly supports an allegation of ordinary negligence. We cannot say that these allegations were part and parcel of diagnosis and treatment which would subject his claim to coverage under the Act. He did not allege any breach of duty directly associated with medical negligence that was integral to the rendering of medical treatment that would subject his claim to the Medical Malpractice Act.

We therefore conclude that because Harts' claim was not subject to a medical panel's review, the trial court erred in setting aside the jury's verdict and in granting Caylor–Nickel's motion for judgment on the evidence.

The judgment is reversed with instruction that the jury's verdict be reinstated.

CONOVER, J., concurs.

SULLIVAN, J., dissents with opinion.

SULLIVAN, Judge, dissenting.

In *Methodist Hospital of Indiana, Inc. v. Ray (1990)*, 2d Dist. Ind.App., 551 N.E.2d 463, we recently held that a complaint alleging that the defendant hospital "negligently and carelessly caused and permitted its premises to become infested and infected with the deadly ... Legionnaire's Pneumonia Virus" did not fall within the Medical Malpractice Act. We noted that the complaint did not allege "failure of appropriate care" and that the allegations did not relate to any scheme of health care. Accordingly, we affirmed the trial court's denial of defendant's 12(b)(1) Motion to Dismiss.

In doing so, we stated somewhat broadly that the manner in which the issue is framed is crucial and that if the complaint sounds in ordinary negligence for premises liability rather than for failure to provide health care, it is outside the scope of the Act.

In the case before us, the majority focuses upon the aspect of "ordinary negligence" involved with the hospital personnel's failure to properly secure the bedrail.[1] It would seem to hold that a claim does not fall within the coverage of the Act unless the breach of duty is "directly associated with ... medical negligence." Slip Opinion at 8. I do not believe that the term "health care" is to be so narrowly construed.

In *Ogle v. St. John's Hickey Memorial Hospital* (1985) 2d Dist.Ind.App., 473 N.E.2d 1055, *trans. denied*, a patient in the psychiatric unit of defendant hospital was raped by another patient. Ogle's complaint alleged negligent failure to provide security and protection. We held that the complaint alleged a failure to provide health care because Ogle's proper confinement was "part and parcel of the diagnosis and treatment of her condition." *Id.* at 1059.

Although the facts in Ogle may fall at the very margin of what constitutes health care, it indicates that we have previously included conduct which is not clearly "medical negligence."

Be that as it may, Harts himself states that in his "*care and treatment*, the decision was made that side rails should be placed in the 'up' position". Appellant's brief at 23 (Emphasis supplied). In this regard, as well as in consideration of the differing facts, our decision in the *Ray* case, *supra*, must be distinguished.

Furthermore, authority from two other jurisdiction lends support to my conclusion that the claim here is within the coverage of the Act.

*Zobac v. Southeastern Hospital District of Palm Beach County* (1980) Fla.App., 382 So.2d 829, distinguished an earlier case, *Mount Sinai Hospital of Greater Miami, Inc. v. Wolfson* (1976) Fla.App., 327 So.2d 883, 884, in which the plaintiff had alleged, *inter alia*, that a hospital had failed to provide proper and adequate bed rails to insure the protection of its patients. The *Zobac* decision observed that the allegation in the *Wolfson* case created an issue of malpractice as opposed to the issue in *Zobac* which was ordinary non-medical negligence.[2] In *Pitre v. Hospital Services District No. 1* (1988) La.App., 532 So.2d 501, plaintiff brought suit for injuries sustained when the footrest of an x-ray table became detached causing her to fall. The court held the complaint to be within the coverage of the Medical Malpractice Act reasoning that the injuries "were incurred when a machine which was integral to the rendering of treatment did not function properly." 532 So.2d at 502.

Beds in which hospital patients are placed during the course of their care and treatment routinely and necessarily have attributes and features not found on ordinary beds in private homes, hotels and the

---

1. The majority equates this failure with the "negligent maintenance of the provider's business premises" found to be outside the Act in *Winona Memorial Foundation of Indianapolis v. Lomax* (1984) 4th Dist. Ind.App., 465 N.E.2d 731, 739.

2. It should be noted that the particular Florida legislation involved in the *Wolfson* case was subsequently declared unconstitutional upon grounds that the narrow and rigid statute of limitations violated due process. *Aldana v. Holub* (1980) Fla., 381 So.2d 231.

like. Such features exist for the facilitation of care and treatment and for protection of the patient. They are an integral part of the medical care. For this reason, I would hold that the allegations concerning negligence with regard to the positioning of the bed rails place this lawsuit within the purview of our Medical Malpractice Act.

I would affirm the judgment.[3]

---

**3.** It may be noted that the trial court arguably had available an alternative to vacating the jury verdict. The court might have observed that I.C. 16–9.5–9–2.1 (Burns Code Ed.Supp.1989) permits avoidance of the Act if the plaintiff restricts his claim to $15,000 or less. Although framing of a claim precludes a recitation of the amount of damages requested (T.R. 8(A)(2)) and differs, in any event, from an actual damage award, it may have been permissible for the court to give plaintiff an opportunity for remittitur so as to reduce his recovery to $15,000. *See Weenig v. Wood* (1976) 2d Dist., 169 Ind. App. 413, 349 N.E.2d 235.