In the

# United States Court of Appeals
## For the Seventh Circuit

No. 17-3060

BILLIE THOMPSON, as personal representative of the ESTATE OF
DUSTY HEISHMAN,

*Plaintiff-Appellee,*

*v.*

LANCE COPE,

*Defendant-Appellant.*

No. 18-1223

BILLIE THOMPSON, as personal representative of the ESTATE OF
DUSTY HEISHMAN,

*Plaintiff-Appellee,*

*v.*

LANCE COPE and HEALTH AND HOSPITAL CORPORATION OF
MARION COUNTY,

*Defendants-Appellants.*

Appeals from the United States District Court for the
Southern District of Indiana, Indianapolis Division.
No. 15-CV-1712 — **Tanya Walton Pratt**, *Judge.*

ARGUED MAY 31, 2018 — DECIDED AUGUST 14, 2018

_____

Before FLAUM, MANION, and HAMILTON, *Circuit Judges*.

HAMILTON, *Circuit Judge*. We address here two interlocutory appeals in a case stemming from the death of Dusty Heishman. In Indianapolis in October 2014, Heishman was high on amphetamines and running around naked in the street. Police responded and tried to subdue him. A paramedic arrived on the scene and administered a sedative to Heishman so he could be moved to an ambulance to be taken to an arrestee holding room at a hospital. Soon, Heishman's heart and breathing stopped. Despite efforts to revive him, he died several days later.

Heishman's estate sued, asserting federal Fourth Amendment claims and state-law tort claims. The district court denied qualified immunity to the paramedic on the excessive force claim. The court also allowed all but one of the state-law claims to proceed against the paramedic and the hospital without requiring the plaintiff estate to comply with the Indiana Medical Malpractice Act, Ind. Code § 34-18-1-1 et seq. The denial of qualified immunity is appealable as to legal issues, and the district court certified for interlocutory appeal under 28 U.S.C. § 1292(b) the state-law question whether the estate's claims are covered by the Indiana Medical Malpractice Act.

We reverse as to both issues. The paramedic is entitled to qualified immunity on the excessive force claim. Case law did not (and does not) clearly establish that a paramedic can violate a patient-arrestee's Fourth Amendment rights by exercising medical judgment to administer a sedative in a medical

emergency. All of the state-law claims are subject to the substantive terms of Indiana's Medical Malpractice Act, including damage caps and the requirement to submit the claim to a medical review panel before suit is filed. The undisputed facts show that the paramedic was exercising medical judgment in dealing with a patient in a medical emergency.

I. *Factual and Procedural Background*

The district court stated the relevant facts in its summary judgment order. *Thompson v. City of Indianapolis*, 2017 WL 4248006, at *1–3 (S.D. Ind. Sept. 25, 2017). "Our review on appeal from denial of summary judgment based on qualified immunity is limited to questions of law, so we recount the facts as stated by the district court in its assessment of the summary judgment record." *Estate of Clark v. Walker*, 865 F.3d 544, 547 (7th Cir. 2017), citing *Locke v. Haessig*, 788 F.3d 662, 665 (7th Cir. 2015); see also *Stinson v. Gauger*, 868 F.3d 516, 522–28 (7th Cir. 2017) (en banc) (no jurisdiction over appeal of denial of qualified immunity where defendants challenged facts and inferences on appeal).

On October 5, 2014, paramedic Lance Cope was dispatched to the south side of Indianapolis for an animal bite. When he arrived, he learned that the bite was not from an animal but from a man, Dusty Heishman. Before Cope could treat the bite patient, an Indianapolis police officer approached Cope and said he needed him to "take a look" at Heishman, who "was being combative."

Heishman was naked and lying prone in the middle of the street. His hands were cuffed behind his back and his ankles were shackled together. He had been tased by a police officer and had been punched and choked in a physical struggle with

two civilians who helped the officer wrestle Heishman to the ground.

The police had responded to a report that Heishman was naked, belligerent, and roaming the neighborhood. The responding officer noticed that Heishman was sweating profusely and appeared to be on drugs. Heishman approached the officer's vehicle despite the officer's oral commands to calm down and sit down on the ground. The officer tased Heishman, but Heishman pulled the wires out of the taser, jumped back onto his feet, and tried to get into the officer's car. Despite oral commands to calm down or sit down, Heishman stared through the officer and repeatedly said "they're trying to kill me, they're trying to kill me." After more officers arrived, they tried to put Heishman in the back of a police transport wagon. Heishman resisted and knocked the officers off balance, but the officers ultimately got Heishman back on the ground and held him there. Heishman was still struggling and fighting the officers who were holding him down. That was the scene when paramedic Cope arrived.

Cope assessed Heishman. After checking Heishman's airway, breathing, and pulse, he suspected Heishman was on amphetamines. The district court relied on Cope's report (which is consistent with his deposition testimony), which said he injected Heishman with a sedative, Versed, as a "chemical restraint for patient and crew safety." While the sedative took effect, Cope visually monitored Heishman by watching his breathing and watching for any struggling. Cope did not use medical equipment to monitor Heishman's vital signs. The medics and the officers picked Heishman up, laid him on his back on a cot, covered him with a blanket, and moved him toward a waiting ambulance.

The darkness (it was after 8:00 p.m. on an October night) made it difficult for Cope to make an assessment. But once Heishman was in the ambulance, Cope saw that Heishman was not breathing and found he had no pulse. Seven minutes of CPR restored Heishman's heartbeat and breathing, but he remained unconscious. Heishman lost brain function and died eight days later.

Heishman's estate sued Cope, the Health and Hospital Corporation of Marion County ("the hospital"), and other defendants in state court. The estate brought claims under 42 U.S.C. § 1983 against Cope in his individual and official capacities for excessive force, deliberate indifference, and failure to protect/intervene. The estate also brought six state-law claims against Cope, the hospital, or both: wrongful death, damages resulting from injuries sustained before Heishman's death, intentional infliction of emotional distress, negligent infliction of emotional distress, negligence, and battery. The defendants removed the case to federal court based on federal-question jurisdiction over the constitutional claims, with supplemental jurisdiction over the state-law claims.

Cope and the hospital moved to dismiss the state-law claims for what they called lack of subject-matter jurisdiction, arguing that Indiana's Medical Malpractice Act required the estate to take those claims before a medical review panel before filing suit. The district court dismissed the wrongful death claim against the hospital but denied the motion with respect to the other state-law claims. *Thompson v. City of Indianapolis*, 2016 WL 4541434, at *4 (S.D. Ind. Aug. 31, 2016). The defendants moved to reconsider, and the district court denied the motion. *Thompson v. City of Indianapolis*, 2017 WL 4155224

(S.D. Ind. Sept. 19, 2017). The district court certified for interlocutory appeal the question whether the Medical Malpractice Act applied to the estate's state-law claims. *Thompson v. Burnett*, 2017 WL 6606536 (S.D. Ind. Dec. 27, 2017), which we agreed to accept under 28 U.S.C. § 1292(b).

Cope moved for summary judgment on the federal constitutional claims. The district court granted the motion on the official-capacity claims and the claims against Cope for deliberate indifference and failure to protect/intervene, but denied it on the excessive force claim against Cope in his individual capacity. *Thompson*, 2017 WL 4248006, at *4–10. Cope appealed, and we consolidated that appeal with the interlocutory appeal on the state malpractice issue.

II. *Analysis*

A. *Limits of Jurisdiction Over Denial of Qualified Immunity*

Denials of summary judgment are usually treated as unappealable interlocutory orders. *Estate of Clark*, 865 F.3d at 549, citing 28 U.S.C. § 1291, and *Ortiz v. Jordan*, 562 U.S. 180, 188 (2011). When qualified immunity is denied for legal reasons, however, the collateral-order doctrine gives us jurisdiction over the legal issue. *Id.*, citing *Mitchell v. Forsyth*, 472 U.S. 511, 530 (1985); see also *Green v. Newport*, 868 F.3d 629, 632 (7th Cir. 2017) (we may consider such appeals to extent that defendant public official presents an "abstract issue of law" such as "whether the right at issue is clearly established or whether the district court correctly decided a question of law"), quoting *Huff v. Reichert*, 744 F.3d 999, 1004 (7th Cir. 2014).

In such appeals, we lack jurisdiction over factual disputes. *Estate of Clark*, 865 F.3d at 549, citing *Johnson v. Jones*, 515 U.S.

304, 319–20 (1995), and *Locke*, 788 F.3d at 665. We must take the facts as the district court assumed them or accept the plaintiff's version of the facts, *White v. Gerardot*, 509 F.3d 829, 833 (7th Cir. 2007), but we can also look to undisputed evidence even if the district court did not consider it. *Id.* at 833 n.5, citing *Washington v. Haupert*, 481 F.3d 543, 549 & n.2 (7th Cir. 2007). If the appellant challenges the facts or inferences drawn from them, we lack jurisdiction over that challenge. E.g., *Hurt v. Wise*, 880 F.3d 831, 839–40 (7th Cir. 2018) (defendants challenged inferences drawn from recorded interrogations); *Stinson*, 868 F.3d at 522–28 (defendants failed to take plaintiffs version of facts as true); *Gutierrez v. Kermon*, 722 F.3d 1003, 1008–14 (7th Cir. 2013) (defendants' argument depended upon disputed fact); *Whitlock v. Brueggemann*, 682 F.3d 567, 573–75 (7th Cir. 2012) (defendants essentially argued there was no genuine issue of fact).

The district court held here that Cope acted in a law-enforcement capacity because he assisted the officers "in effectuating Heishman's arrest, not rendering emergency medical services." *Thompson*, 2017 WL 4248006, at *6, citing *Thompson*, 2016 WL 4541434, and *Thompson*, 2017 WL 4155224. Assuming that the role or capacity in which paramedic Cope acted when he administered the sedative is an issue of fact, see *McKenna v. Edgell*, 617 F.3d 432, 439 (6th Cir. 2010) (whether police officers acted in medical role was issue of fact), we lack jurisdiction to review that finding by the district court. The appellants argue that undisputed facts require the opposite conclusion because Cope assessed Heishman, thought he was under the influence of drugs and in a state of excited delirium (which is a medical emergency), and decided independently to administer the sedative. The district court considered those facts and said that they did "not negate the overarching fact that Medic

Cope was asked by law enforcement officers to assist them in dealing with a combative, resisting arrestee." *Thompson*, 2017 WL 4155224, at *5. The appellants repeatedly challenge the district court's inference, but in this interlocutory appeal, we cannot "revisit the inferences that the district court found could reasonably be drawn." *Hurt*, 880 F.3d at 839. In essence, the appellants challenge the sufficiency of the evidence. They argue that the evidence is insufficient to support the district court's conclusion that Cope helped officers arrest Heishman. That looks like "a back-door effort to contest the facts," *Jones v. Clark*, 630 F.3d 677, 680 (7th Cir. 2011), but we need not decide that issue definitively. We have jurisdiction to decide the appeal on a different issue of law.

B.  *Denial of Qualified Immunity*

When a district court denies summary judgment based on qualified immunity, our review of legal issues is both permitted and *de novo. Estate of Clark*, 865 F.3d at 549, citing *Levin v. Madigan*, 692 F.3d 607, 622 (7th Cir. 2012). "Qualified immunity 'protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Id.* at 549–50 (internal quotation marks omitted), quoting *Pearson v. Callahan*, 555 U.S. 223, 231 (2009). The qualified immunity analysis at summary judgment is a two-step inquiry: "(1) whether the facts, taken in the light most favorable to the plaintiff, show that the defendant violated a constitutional right; and (2) whether the constitutional right was clearly established at [that] time." *Estate of Clark*, 865 F.3d at 550, quoting *Gonzalez v. City of Elgin*, 578 F.3d 526, 540 (7th Cir. 2009). We have discretion to decide which prong to address first. *Pearson*, 555 U.S. at 236. If the

answer to either question is no, the defendant official is enti-
tled to summary judgment. *Gibbs v. Lomas*, 755 F.3d 529, 537
(7th Cir. 2014).

### 1. *Step 1: Violation of a Constitutional Right*

The plaintiff estate has not cited any cases holding that a
paramedic could violate a patient's Fourth Amendment rights
by rendering medical treatment. We have found just two
opinions allowing such cases to go forward. E.g., *Estate of
Barnwell v. Roane County*, 2016 WL 5937821, at *6–7 (E.D. Tenn.
June 16, 2016) (denying qualified immunity on excessive force
claim against paramedics who administered paralytic be-
cause fact issues existed regarding medical necessity of seda-
tion and paramedics' intent where plaintiff's expert opined
there was no medical reason to paralyze decedent's lungs),
*appeal dismissed in part sub nom. Estate of Barnwell v. Grigsby*,
681 F. App'x 435, 442 (6th Cir. 2017); *Haas v. County of El Do-
rado*, 2012 WL 1414115, at *4–10 (E.D. Cal. Apr. 23, 2012)
(denying motion to dismiss and denying qualified immunity
to paramedics on excessive force claim where police officers
allegedly ordered paramedics to inject tranquilizer into con-
scious patient who declined treatment). Given the undisputed
facts here, we doubt that the reasoning of those cases applies.
In any event, the second prong of the qualified immunity
analysis is dispositive here, so we decline to decide the first.
E.g., *Green*, 868 F.3d at 633.

### 2. *Step 2: Clearly Established Law*

We have appellate jurisdiction to review the legal issue at
the second step of qualified immunity analysis: whether the
constitutional right that Heishman's estate asserts was clearly
established at the time Cope administered the sedative.

Clearly established law "must be 'particularized' to the facts of the case." *White v. Pauly*, 137 S. Ct. 548, 552 (2017), quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987). In other words, "existing precedent must have placed the statutory or constitutional question beyond debate." *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011), citing *Anderson*, 483 U.S. at 640, and *Malley v. Briggs*, 475 U.S. 335, 341 (1986).[1] The Supreme Court has also taught that the issue is whether the state of the law at the time of a defendant's actions would have given the defendant "fair warning" that her conduct was unconstitutional. *Hope v. Pelzer*, 536 U.S. 730, 741 (2002). In *Hope*, the Court denied qualified immunity and held that handcuffing a prisoner to a hitching post violated clearly established law. *Hope* teaches that a case directly on point is not required. *Id.*

---

[1] Scholars have criticized this standard. See, e.g., Brief for Scholars of the Law of Qualified Immunity as Amici Curiae Supporting Petitioner at 3–4, *Almighty Supreme Born Allah v. Milling* (No. 17-8654), 2018 WL 3388318, at *3–4 ("Current doctrine thus forces § 1983 plaintiffs to thread a narrowing gap: to find 'existing precedent' that puts 'the statutory or constitutional question *beyond debate*,' *Mullenix*, 136 S. Ct. at 308 (emphasis added) (quoting *al-Kidd*, 563 U.S. at 741), while the Court has all but halted the development of new precedents to rely on in the future."); see also *Thompson v. Clark*, — F. Supp. 3d —, —, 2018 WL 3128975, at *6–13 (E.D.N.Y. June 26, 2018) (Weinstein, J.) (discussing doctrinal criticisms and developments and denying qualified immunity where "precedent and policy rationale fail to justify an expansive regime of immunity that would prevent plaintiff from proving a serious constitutional violation"), citing Michael Silverstein, Note, *Rebalancing Harlow: A New Approach to Qualified Immunity in the Fourth Amendment*, 68 Case W. Res. L. Rev. 495, 533 (2017); William Baude, *Is Qualified Immunity Unlawful?*, 106 Calif. L. Rev. 45 (2018) (criticizing doctrinal underpinnings of qualified immunity and arguing that modern doctrine has no legal basis).

("officials can still be on notice that their conduct violates established law even in novel factual circumstances").

Given those standards, how should courts analyze whether a right is clearly established? The Supreme Court has "repeatedly told courts … not to define clearly established law at a high level of generality." *al-Kidd*, 563 U.S. at 742 (citations omitted); see also *Sanzone v. Gray*, 884 F.3d 736, 741 (7th Cir. 2018) ("reliance on the general standard for excessive force 'is not enough' because the right must be 'clearly established in a more particularized, and hence more relevant, sense'") (internal quotation marks omitted), quoting *Saucier v. Katz*, 533 U.S. 194, 201–02 (2001). Defining the right too broadly "may defeat the purpose of qualified immunity." *Abbott v. Sangamon County*, 705 F.3d 706, 732 (7th Cir. 2013), citing *Hagans v. Franklin County Sheriff's Office*, 695 F.3d 505, 508–09 (6th Cir. 2012); see also *Golodner v. Berliner*, 770 F.3d 196, 206 (2d Cir. 2014) ("If … the right is defined too broadly, the entire second prong of qualified immunity analysis will be subsumed by the first and immunity will be available rarely, if ever."), citing *al-Kidd*, 563 U.S. at 742. On the other hand, defining the right too narrowly is equally problematic. That error "may defeat the purpose of § 1983." *Abbott*, 705 F.3d at 732, citing *Hagans*, 695 F.3d at 508–09; see also *Golodner*, 770 F.3d at 206 ("If the right is defined too narrowly based on the exact factual scenario presented, government actors will invariably receive qualified immunity."). The Second Circuit has said that the "Goldilocks principle" illustrates the "middle course" between the two extremes— not too broad, not too narrow, but just right. *Golodner*, 770 F.3d at 206.

Can we be more specific? Precedent tied to particularized facts can indicate that law is clearly established, but the Supreme Court does "not require a case directly on point." *al-Kidd*, 563 U.S. at 741, citing *Anderson*, 483 U.S. at 640, and *Malley v. Briggs*, 475 U.S. 335, 341 (1986); accord, e.g., *Green*, 868 F.3d at 633 ("a case directly on point is not required"); *Golodner*, 770 F.3d at 206 ("[t]his is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful"), quoting *Anderson*, 483 U.S. at 640. "Of course, there can be the rare 'obvious case,' where the unlawfulness of the officer's conduct is sufficiently clear even though existing precedent does not address similar circumstances." *District of Columbia v. Wesby*, 138 S. Ct. 577, 590 (2018), quoting *Brosseau v. Haugen*, 543 U.S. 194, 199 (2004); see also *Vinyard v. Wilson*, 311 F.3d 1340, 1350–514 (11th Cir. 2002) (explaining that "obvious clarity" cases can exist (1) where a statute or constitutional provision is "specific enough to establish clearly the law applicable to particular conduct and circumstances and to overcome qualified immunity, even in the *total absence of case law*" and (2) where "broad statements of principle in case law are not tied to particularized facts and can clearly establish law applicable in the future to different sets of detailed facts"). "[G]eneral statements of the law" can give defendants "fair and clear warning," *White*, 137 S. Ct. at 552, quoting *United States v. Lanier*, 520 U.S. 259, 271 (1997), but "in the light of pre-existing law the unlawfulness must be apparent." *Id.*, quoting *Anderson*, 483 U.S. at 640.

As we view this case, the question for qualified immunity is whether it was clearly established in 2014 that a paramedic "seizes" an arrestee and is subject to Fourth Amendment limits on excessive force by sedating the arrestee—who appears to the paramedic to be suffering from a medical emergency—

before taking the arrestee by ambulance to the hospital. It was not.

The district court defined the asserted right too broadly. It said that "officers cannot use excessive force in effectuating an arrest." *Thompson*, 2017 WL 4248006, at *6 (collecting cases). That "lofty definition of the right" is just "one floor down from the words of the Fourth Amendment itself ('the right to be free of "unreasonable … seizures"') and two floors down from the highest level of generality possible ('the right to be free from a constitutional violation')." *Hagans*, 695 F.3d at 508. The district court's formulation suggests that it tried to treat this case as an obvious one, evident from broad principles in excessive force cases. But we do not think a paramedic (or his lawyer) reasonably familiar with circuit and Supreme Court precedent would have understood that the Fourth Amendment prohibition of unreasonable searches and seizures applies to treatment in the field during a medical emergency. Fourth Amendment restrictions are almost wholly alien to that situation, where paramedics are subject to a distinct set of professional standards and goals aimed at responding to medical emergencies. See *Peete v. Metropolitan Government of Nashville and Davidson County*, 486 F.3d 217, 222 (6th Cir. 2007) (reversing denial of qualified immunity for paramedics on excessive force claim; paramedics who responded to 911 call about an epileptic seizure "acted in order [to] provide medical aid" and did not act "to enforce the law, deter or incarcerate" by restraining patient while patient was in prone position).

The district court's formulation "defines the qualified immunity inquiry at a high level of generality … and then fails to consider that question in 'the specific context of the case.'" *Mullenix v. Luna*, 136 S. Ct. 305, 311 (2015), quoting *Brosseau*,

543 U.S. at 198. Neither the plaintiff estate nor the district court cited any case where a court found that conduct like Cope's—administering a therapeutic drug in response to a medical emergency—violated the Fourth Amendment.

The cases cited by plaintiff and the district court involved excessive force cases brought against police officers. See *Thompson*, 2017 WL 4248006, at *6, citing *Graham v. Connor*, 490 U.S. 386 (1989) (placing arrestee face down on hood of police car and then throwing arrestee headfirst into car), *Tennessee v. Garner*, 471 U.S. 1 (1985) (fatally shooting fleeing suspect), *Abdullahi v. City of Madison*, 423 F.3d 763 (7th Cir. 2005) (kneeling on suspect's back while suspect was prone on ground, causing chest and neck trauma ultimately resulting in death), and *Payne v. Pauley*, 337 F.3d 767 (7th Cir. 2003) (slamming handcuffs on arrestee's wrist, jerking wrist, and tightening handcuffs until arrestee could not feel hands). None of those cases involved a health care provider—assisting officers or otherwise—using a therapeutic drug to sedate an arrestee to be taken safely to the hospital. The estate does not cite any case where a court held that conduct like Cope's in circumstances at all like these violated the Fourth Amendment.

The estate cited one case involving medical defendants, but it is quite distinct in both fact and theory. In *Rivas v. City of Passaic*, 365 F.3d 181 (3d Cir. 2004), the decedent's family brought a § 1983 claim against medical defendants based on a theory of state-created danger—not excessive force, which is the only remaining theory for the plaintiff's estate here because the district court dismissed the claims for failure to protect or intervene and deliberate indifference. In *Rivas*, the Third Circuit affirmed the denial of qualified immunity for

two emergency medical technicians who responded to a patient who was having a seizure. The court found that a jury could have found that the EMTs misrepresented an assault to later-responding law enforcement officers, failed to inform the officers that the decedent was having a seizure and should not be restrained, and then bound the decedent's ankles with cloth restraints anyway. *Id.* at 187, 194–97, 200–01.

Qualified immunity exists to avoid or at least to reduce the risk of the kind of catch-22 that would result from accepting the estate's position: treat the arrestee or don't treat him, but face a lawsuit either way. Suppose we put aside for a moment the human and professional ethics and responsibilities of paramedics and police officers when confronting a person in dire straits. Let's focus only on legally enforceable duties. If the officers and paramedic had not responded to Heishman's excited delirium, they could easily have found themselves defending against a deliberate indifference claim for ignoring his obvious and serious medical needs. See, e.g., *Florek v. Village of Mundelein*, 649 F.3d 594, 598 (7th Cir. 2011) (officer can violate Fourth Amendment by failing to respond to arrestee's medical needs), citing *Sides v. City of Champaign*, 496 F.3d 820, 828 (7th Cir. 2007); *Salazar v. City of Chicago*, 940 F.2d 233, 237 (7th Cir. 1991) (paramedics can violate due process right by failing to treat arrestee's injuries), citing *DeShaney v. Winnebago County Dep't of Social Services*, 489 U.S. 189, 200 (1989), *Archie v. City of Racine*, 847 F.2d 1211, 1222 (7th Cir. 1988) (en banc), and *K.H. v. Morgan*, 914 F.2d 846, 849 (7th Cir. 1990).

That dilemma helps to explain why the right the plaintiff estate asserts here was not clearly established under the circumstances. To treat the right as clearly established, the district court boiled away key circumstances of the situation

here—especially the fact that Cope was a paramedic confronting a patient suffering from a life-threatening emergency. Those facts take this case out of the realm of clearly established Fourth Amendment law. It was not clearly established that a paramedic effects a "seizure" within the meaning of the Fourth Amendment and subjects himself to an excessive force claim by sedating an arrestee who is suffering from a medical emergency to take the arrestee to the hospital. Defendant Cope was entitled to summary judgment on the Fourth Amendment claim.[2]

C. *The Indiana Medical Malpractice Act Issues*

The district court certified for interlocutory appeal the question whether the Indiana Medical Malpractice Act applies to the estate's state-law claims. See Ind. Code § 34-18-1-1 et seq. That question comes to us with some "procedural hiccups," see *Miller v. Herman*, 600 F.3d 726, 731 (7th Cir. 2010), because of the different ways state and federal courts use the label "jurisdictional." On the merits, we conclude that the estate's state-law claims must be dismissed without prejudice. Those claims are subject to the Indiana Medical Malpractice Act and must be presented to a medical review panel under the Act before the plaintiff estate may proceed in court. See Ind. Code § 34-18-8-4. The medical review panel requirement is a substantive feature of the Act that must be enforced

---

[2] We can imagine a different case where the excessive force question would be closer. This is not, for example, a case where an arresting officer summons a paramedic and then orders the paramedic to sedate an arrestee who does not need medical care just so the officer can put the arrestee in the back of a police car more easily. Cf. *Haas*, 2012 WL 1414115, at *2 (plaintiff alleged police officers ordered paramedic to inject plaintiff with tranquilizer).

in federal court. *Hines v. Elkhart General Hospital*, 603 F.2d 646, 649–50 (7th Cir. 1979); see also *Hahn v. Walsh*, 762 F.3d 617, 633 (7th Cir. 2014) (discussing *Hines* and holding that similar requirement applies to Illinois malpractice claims in federal court). Before addressing the merits, we first address the procedural issues.

### 1. *Sorting Out the Procedural Confusion*

The defendants moved to dismiss for lack of subject-matter jurisdiction. That label would be correct under state law applying the Medical Malpractice Act. E.g., *Lorenz v. Anonymous Physician #1*, 51 N.E.3d 391, 396 (Ind. App. 2016) ("a trial court does not generally have jurisdiction over a medical malpractice action until proceedings before the Department of Insurance conclude"). It is not correct under federal law.

In cases like this, where the defense moved to dismiss for lack of subject-matter jurisdiction under Rule 12(b)(1) on the theory that the plaintiff failed to satisfy a non-jurisdictional requirement to exhaust administrative remedies, federal courts should treat the motion as one to dismiss for failure to state a claim under Rule 12(b)(6). See, e.g., *Smoke Shop, LLC v. United States*, 761 F.3d 779, 782 n.1 (7th Cir. 2014) (affirming dismissal under Rule 12(b)(6)); *Miller v. Herman*, 600 F.3d at 732–33 (converting mislabeled jurisdictional motion to Rule 12(b)(6) motion), citing *Reynolds v. United States*, 549 F.3d 1108, 1111–12 (7th Cir. 2008), *Palay v. United States*, 349 F.3d 418, 424–25 (7th Cir. 2003), *Health Cost Controls v. Skinner*, 44 F.3d 535, 538 (7th Cir. 1995), and *Peckmann v. Thompson*, 966 F.2d 295, 297 (7th Cir. 1992); see also *Reed v. Columbia St. Mary's Hospital*, 782 F.3d 331, 336 (7th Cir. 2015) (appellate court "can

ignore the mischaracterization" when district court mischaracterizes merits dismissal as jurisdictional), citing *Gogos v. AMS Mech. Systems, Inc.*, 737 F.3d 1170, 1172 (7th Cir. 2013).

The defendants' motion here did not actually address federal jurisdiction, but as noted, Indiana courts speak in terms of subject-matter jurisdiction when dismissing claims that are subject to the Medical Malpractice Act but have not gone through the medical review panel process. *Lorenz*, 51 N.E.3d at 396. A jurisdictional label under state law does not affect a federal court's subject-matter jurisdiction because "state law cannot enlarge or contract federal jurisdiction." *Jarrard v. CDI Telecommunications, Inc.*, 408 F.3d 905, 909 n.3 (7th Cir. 2005) (district court "properly construed" motion filed under Rule 12(b)(1) as motion under Rule 12(b)(6); district court had diversity jurisdiction even though Indiana law gave state board exclusive "jurisdiction" over worker's compensation and related tort claims), citing *Goetzke v. Ferro Corp.*, 280 F.3d 766, 779 (7th Cir. 2002), and *Beach v. Owens–Corning Fiberglas Corp.*, 728 F.2d 407, 409 (7th Cir. 1984).

This procedural hiccup turns out to have been harmless, though. Both sides had a fair opportunity to submit relevant evidence, and the legal issue can be decided based on undisputed facts. The parties litigated (and the district court decided) whether the Medical Malpractice Act applies based on evidence. Without saying so, the district court effectively converted the motion to reconsider the denial of the motion to dismiss into a motion for summary judgment by considering "matters outside the pleadings." Fed. R. Civ. P. 12(d); see also *Miller*, 600 F.3d at 733 (treating motion to dismiss under Rule 12(b)(1) as motion under Rule 12(b)(6) and, in turn, treating motion to dismiss as motion for summary judgment where

moving party framed motion to dismiss in the alternative as a motion for summary judgment and non-moving party had opportunity to present responsive evidence), citing *Tri–Gen Inc. v. Int'l Union of Operating Eng'rs, Local 150*, 433 F.3d 1024, 1029 (7th Cir. 2006), and *Malak v. Associated Physicians, Inc.*, 784 F.2d 277, 280 (7th Cir. 1986).

Treating a motion to dismiss as a motion for summary judgment without giving the non-moving party notice of the conversion and an opportunity to respond with evidentiary material would pose a problem that could require a remand. That is not what happened here. When the defendants submitted evidence to support their motion to reconsider the denial of their motion to dismiss, the plaintiffs responded and submitted evidence in return. See Dkt. 61 (defendant's designations); Dkt. 68 (plaintiff's designations in response). That satisfied Rule 12(d)'s requirement that "parties must be given a reasonable opportunity to present all the material that is pertinent to the motion." See also *Miller*, 600 F.3d at 733 (affirming dismissal where non-moving party had fair opportunity to present evidence). On appeal, plaintiffs do not argue that the district court's procedure prevented them from designating additional evidence. In any event, our standard of review is still *de novo*. See *id.* (standard of review is *de novo* for motions under Rules 12(b)(1), 12(b)(6), and 56).

We note one other procedural anomaly. The district court will need to dismiss the claims *without prejudice* so that the estate can refile the state-law claims if it clears the medical review panel process. The defendants acknowledge that a dismissal without prejudice is the proper result here. It is unusual for summary judgment to produce a dismissal without

prejudice, but it is possible. See, e.g., *Fluker v. County of Kankakee*, 741 F.3d 787, 791 (7th Cir. 2013) (summary judgment for failure to exhaust administrative remedies as required by Prison Litigation Reform Act should result in dismissal without prejudice), citing *Ford v. Johnson*, 362 F.3d 395, 400–01 (7th Cir. 2004). On to the merits.

2. *Scope of the Medical Malpractice Act*

Claims for medical malpractice in Indiana are subject to a series of special requirements. One of the most important is that, subject to limited exceptions that do not apply here, claims must be presented to a medical review panel before the plaintiff may pursue a claim in court. Ind. Code § 34-18-8-4. Medical review panels include three providers, two of whom must be from the individual defendant's profession or specialty, and a non-voting attorney, who chairs the panel. §§ 34-18-10-3(a)–(b) & -10-8. Each party may pick one provider panelist, and those two panelists pick the third. § 34-18-10-6. The panel has "the sole duty" to provide an expert opinion on whether the evidence supports the conclusion that the provider "acted or failed to act within the appropriate standards of care." § 34-18-10-22. The opinion is "admissible as evidence in any action subsequently brought by the claimant" but "is not conclusive." § 34-18-10-23. Malpractice claims are also subject to statutory caps on damages. § 34-18-14-3.[3]

---

[3] As noted above, while the medical review panel process might appear to be "procedural" for *Erie Railroad* purposes, we have held that its substantive policy foundations and effects make the requirement applicable in federal civil actions. *Jones v. Griffith*, 870 F.2d 1363, 1368 (7th Cir. 1989), citing *Hines v. Elkhart General Hospital*, 603 F.2d 646 (7th Cir. 1979).

The estate's claims are subject to the Medical Malpractice Act because the undisputed evidence indicates that Cope acted to promote Heishman's health and exercised his medical judgment to do so. It is undisputed that Cope assessed Heishman, thought he was in excited delirium, which can result in cardiac arrest, and gave the sedative for Heishman's and the crew's safety.

These facts fit comfortably within the broad statutory definitions of the Medical Malpractice Act. Modern Indiana statutes tend to be written so that a great deal of substantive law is placed in the statutory definitions. That is true here. Heishman was a "patient" who received "health care" from a "health care provider." The Act defines "patient" as "an individual who receives or should have received health care from a health care provider, under a contract, express or implied, and includes a person having a claim of any kind, whether derivative or otherwise, as a result of alleged malpractice on the part of a health care provider." Ind. Code § 34-18-2-22. The Act defines "health care" as "an act or treatment performed or furnished, or that should have been performed or furnished, by a health care provider for, to, or on behalf of a patient during the patient's medical care, treatment, or confinement." § 34-18-2-13. And the Act in turn defines "health care provider" to include a "paramedic." § 34-18-2-14(1). All of the state-law claims relate to Cope's administration of the sedative. That makes them claims for "malpractice," which is defined as "a tort or breach of contract based on health care or professional services that were provided, or that should have been provided, by a health care provider, to a patient." § 34-18-2-18.

Our reasoning is consistent with Indiana courts' approach to these statutory questions. To determine whether a claim is for malpractice, Indiana courts analyze its substance, not its label. See *Robertson v. Anonymous Clinic*, 63 N.E.3d 349, 359 (Ind. App. 2016), citing *Van Sice v. Sentany*, 595 N.E.2d 264, 267 (Ind. App. 1992), and *Popovich v. Danielson*, 896 N.E.2d 1196, 1202–04 (Ind. App. 2008). Regardless of labels, "claims that boil down to a 'question of whether a given course of treatment was medically proper and within the appropriate standard' are the 'quintessence of a malpractice case.'" *Howard Regional Health System v. Gordon*, 952 N.E.2d 182, 185 (Ind. 2011), quoting *Van Sice*, 595 N.E.2d at 267. "By contrast, to fall outside the Malpractice Act a health care provider's actions must be demonstrably unrelated to the promotion of the plaintiff's health or an exercise of the provider's professional expertise, skill, or judgment." *Id.* at 186, citing *Kuester v. Inman*, 758 N.E.2d 96 (Ind. App. 2001), and *Collins v. Thakkar*, 552 N.E.2d 507, 510 (Ind. App. 1990).

The estate's claims against Cope and the hospital do not "sound[] in ordinary negligence where the factual issues are capable of resolution by a jury without application of the standard of care prevalent in the local medical community." *Anonymous Hospital, Inc. v. Doe*, 996 N.E.2d 329, 333 (Ind. App. 2013), citing *Murphy v. Mortell*, 684 N.E.2d 1185, 1188 (Ind. App. 1997) (claim based on sexual battery by hospital employee during hospitalization fell outside Act), *Doe by Roe v. Madison Center Hospital*, 652 N.E.2d 101, 103 (Ind. App. 1995) (same for claim based on sexual assault by hospital employee), *Harts v. Caylor–Nickel Hospital, Inc.*, 553 N.E.2d 874, 879 (Ind. App. 1990) (same for claim based on fall from hospital bed after bedrail collapsed), *Winona Memorial Foundation of Indianapolis v. Lomax*, 465 N.E.2d 731, 732 (Ind. App. 1984)

(same for claim based on patient's fall due to protruding hospital floorboard). Instead, the estate's arguments—about whether Cope gave the right dosage of the sedative or negligently failed to monitor Heishman or change his prone position—sound in malpractice. To resolve those issues, a judge or jury will need to evaluate Cope's actions in terms of *medical* standards of care. The accompanying claims for emotional distress are also subject to the Act because they result from the alleged malpractice. *Spangler v. Bechtel*, 958 N.E.2d 458, 472 (Ind. 2011), quoting Ind. Code § 34-18-2-22.

To avoid this reasoning, the estate relies heavily on two cases, but both are readily distinguishable. The first is *Elliott v. Rush Memorial Hospital*, 928 N.E.2d 634, 637 (Ind. App. 2010), where a sheriff's deputy took the plaintiff to the hospital after a traffic stop and told hospital staff that he had court orders for blood and urine samples. The staff forcibly catheterized the plaintiff to obtain a urine sample. The state appellate court affirmed dismissal of the proposed malpractice complaint because the plaintiff was not a "patient" within the meaning of the Medical Malpractice Act. The catheterization "was not for his own medical benefit … but was carried out solely for law enforcement purposes." *Id.* at 640. Here, by contrast, the estate has not cited any evidence indicating that Cope did not exercise medical judgment or that an instruction from police officers somehow trumped his medical judgment. Cope was treating a medical emergency, not gathering evidence.

Second, the estate relies on *Collins v. Thakkar*, 552 N.E.2d 507 (Ind. App. 1990), where the plaintiff alleged that she had a sexual relationship with a physician who, without her con-

sent or knowledge, aborted her pregnancy during a purported pelvic examination. The appellate court reversed dismissal, holding that the doctor's horrific acts "were not designed to promote the patient's health." *Id*. at 511. The estate argues here that Cope's injection of Heishman was unrelated to his health because the sedative was not for his benefit, but for the benefit of Cope and law enforcement to carry out his arrest. The undisputed facts show here, however, that Cope believed Heishman was in a state of excited delirium and gave the sedative for his safety and to transport him to the hospital.

*       *       *

The denial of Cope's motion for summary judgment on the excessive force claim and the denial of defendants' motion to dismiss the state-law claims are REVERSED. The case is REMANDED with instructions to dismiss the estate's state-law claims without prejudice and to dismiss the federal claims against Cope with prejudice.